Henry Clay Greenberg, J.
The picture which is portrayed by this motion to dismiss the amended complaint for insufficiency, or alternatively for other relief, is of far reaching importance to “ Fashion Houses ” and to the dress and allied trades generally. In legal contemplation the situation is of equal moment. The specific question posed is whether piracy of style is to receive the imprimatur of law in a case where there has been a disclosure of the style and design to a limited group of people under an agreement that they would not reveal or copy such styles and design.
This court has had occasion in Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp. (199 Misc. 786, affd. 279 App. Div. 632), to write on a very closely related issue. The challenge to its authority by the moving defendant, or rather the vigorous attempt to distinguish it in principle from the instant case, requires a remarshalling of the applicable rules of equity.
Plaintiffs are well-known Parisian fashion houses. The defendants in New York, two of them corporations, publish a ‘ ‘ sketch service ’ ’ through which there is produced reproductions of plaintiffs’ original designs and sketches, and these are sold to subscribers to the service conducted by the defendants. Such acts are sought to be restrained by the plaintiffs who claim that they have certain property rights in the designs of great commercial value which, through an unlawful conspiracy, have been appropriated by the defendants.
The individual defendant moves to dismiss the amended complaint on the following grounds:
(1) That it fails to state facts sufficient to constitute a cause of action; t
(2j That the plaintiffs did not follow the direction of the court heretofore made that they separately state and number each cause of action in an amended complaint;
(3) That it does not comply with the requirements of section 241 of the Civil Practice Act.
Additionally, defendant seeks to have certain paragraphs of the amended complaint stricken out, pursuant to rule 103 of the Buies of Civil Practice, as irrelevant, redundant, conclusory and evidentiary.
*427 It is well in the beginning to dispose of that branch of the motion seeking relief under items 2 and 3 thereof. With respect to the former, defendant Milton previously moved to require plaintiffs separately to state and number causes of action and this court granted the motion, in a memorandum decision which stated “ The plaintiffs have pleaded in one cause of action unfair competition and infringement of registered names and trade marks ”. These, it was directed, should be separately stated and numbered. Plaintiffs thereupon served the amended complaint here assailed and in it omitted completely the cause of action for ‘ ‘ infringement of registered names and trade marks ” and there, therefore, remains a single cause of action sounding solely in unfair competition. Allegations in the complaint that the defendants have misappropriated and wrongfully traded on the plaintiffs ’ names and reputations are clearly proper. They are elements of plaintiffs’ cause of action for unfair competition.
Also, the fact that specifications of the various unlawful acts and conduct by the defendants are set forth in the complaint does not import that each wrongful act alleged constitutes a separate and distinct cause of action. The complaint postures a single actionable wrong to the plaintiffs giving them a single primary right. Accordingly, that branch of the motion stated under item 2 is denied.
Insofar as the defendant seeks relief under section 241 of the Civil Practice Act and to have certain allegations in the complaint stricken out, it is denied. The amended complaint sets forth a clear and concise statement of the facts upon which plaintiffs relied. The allegations which it is claimed will prove harmful will not be removed from the complaint unless it can be shown that they have no reasonable or probable bearing on the controversy or that they will prejudice the party seeking to have them stricken out. On this score there has been a cojnplete failure.
We come now to the allegations of the complaint and the heart of the controversy. The plaintiff Christian Dior, etc., is, and, for many years, has been known and esteemed throughout the world as an outstanding, leading and famous haute couture house. Christian Dior has been recognized as a leading and famous designer of dresses and accessories and other items of women’s apparel. He is a principal executive of the plaintiff and has designed exclusively for plaintiff dresses and accessories and other items of women’s apparel which are unique, exclusive and original and represent the product of his special skill and genius.
*428 Dior’s commercial activity and reputation depend on the excellence of the designs created by him. In the exploitation of such designs plaintiff has incurred great expense, has acquired a reputation and good will of value and has acquired valuable property rights in its good will and reputation, and its. ¡names ‘‘ Christian Dior ’ ’ and ‘ ‘ Dior ’ ’ have become well and favorably known in France, the United States and throughout. the world.
The complaint alleges matter in regard to the other three plaintiffs of a similar character which need not be repeated here. : It. is then alleged that each of the plaintiffs in order to further ..the exploitation of its unique, exclusive and original designs - and to protect its valuable and recognized property rights therein, uses and for many years has used an elaborate and extensive system of displaying and showing the unique, exclusive and original dresses and accessories and other items of women’s apparel manufactured by it under such conditions as , to make certain that the designs are never published, and the ..models are never revealed to any person or persons other than ....those, who .are legally bound not to make or divulge any reproduction of any or all of the models shown, or any details thereof, - whether by. photographs, sketches, detailed descriptions or otherwise, unless and until specifically authorised by each of the plaintiffs respectively.
Pursuant to the established and existing system set forth above the wearing apparel designed by the plaintiffs are dis- • played and shown at the establishments of each of the plaintiffs in. Paris,- France, at showings held throughout the year, and -..in addition at two major semiannual displays of the collections commencing in or about February and August of each year. Such unique, exclusive and original models as created by each of. the plaintiffs are thereafter displayed by them individually . .to a restricted and exclusive group which includes representatives of the press agencies, representatives of manufacturers, buyers and.retailers in the dress and women’s apparel industry, and other. individuals who are admitted to the displays only -.at.the express invitation of plaintiffs and only after they are • fully aware of, assent to, and agree to be bound by the conditions of admission to the displays and agree to observe and abide by the conditions.
According to the plaintiffs, unauthorized and premature disclosure of information and knowledge relating to the designs and models, manufactured by them, and each of them, greatly affects and destroys the demand for the designs and models and greatly interferes with and hinders the profitable exploitation *429 of designs and models, all to the great injury and detriment of the plaintiffs.
The conditions above mentioned include an agreement by the viewers not to infringe said rights nor to make or divulge any reproductions of any of the models, whether by photographs or sketches, or to transmit them to third persons for the purpose of permitting such persons to make or divulge any such reproduction.
The complaint further alleges that the defendants conspiring together and having full knowledge of the extensive steps taken by the plaintiffs to protect their specific property rights in the designs and models, and to prevent the unauthorized copying and reproduction, and with full knowledge of the conditions which cover the displays, presentations and showings, and also with knowledge of the terms and provisions of the contract used in connection with sales by each of the plaintiffs of models, continuously in use from about 1948, falsely represented to plaintiffs and each of them that they were acting for persons other than the defendants; that they concealed from plaintiffs that they were acting for the defendants; that they fradulently promised and represented that they would not disclose or divulge knowledge and information obtained at said displays; that they gained admittance to the showings and presentations by means of false representations, fraudulent concealment and fraudulent promises; that the defendants fraudulently, wrongfully and willfully induced employees of plaintiffs and each of them and others having confidential and contractual relationship with the plaintiffs to violate the terms of their employment, to breach their positions of trust, and to deliver to the defendant, Milton, and his co-conspirators models and copies of designs and models, and information and knowledge relating to designs and models.
In violation of the conditions for entry to the displays and presentations, and in violation of the agreements, the defendants copied and reproduced surreptitiously, designs and models of plaintiffs and each of the m£nd published and sold, rented and loaned such copies and reproductions to other co-conspirators unauthorized to receive and use them in the United States and elsewhere.
By such acts, the defendants appropriated and continue to appropriate, for their own use and benefit, the results of the expenditures, labor, skill and knowledge of plaintiffs, and unlawfully interfered with and continue to interfere with their property and contractual rights.
*430 The defendants are allegedly thus unfairly competing with the plaintiffs in that the inferior quality of such drawings, sketches and patterns offered for sale and sold by the defendants, tends to diminish public interest in the original designs and models of plaintiffs, and tends to deceive the public into believing that the drawings, sketches and patterns are those of plaintiffs. The acts of the defendants constitute a drawing on and misappropriation of the value of the names and reputations of each of the plaintiffs and the conduct of the defendants endangers the reputation and good will of each of the plaintiffs.
The complaint finally alleges that by reason of the wrongful acts of the defendants, they have impaired the business of the plaintiffs and have been unjustly enriched.
Accordingly, injunctive relief is sought restraining the defendants from exploitation of the designs of plaintiffs, the sale of models and reproductions, the publication of sketches and the sale of the service to others, and generally from competing unfairly with the plaintiffs in the manner and method set forth in the complaint. Plaintiffs also ask for substantial damages and for an accounting.
In support of his claim that the complaint fails to state a sufficient cause of action, the defendant urges that (a) there is no protection against style piracy or the publication of another’s styles; (b) plaintiffs’ publication of the styles destroys any protection which they might otherwise have been entitled to; (c) there is no public interest involved, and therefore the granting of relief to plaintiffs would violate the due process clause of the Constitution, and defendants’ right to free speech and publication; (d) plaintiffs’ practices are in restraint of trade; and (e) only internal trade secrets under certain circumstances should be protected.
In passing upon the question of the sufficiency of this complaint alleging unfair competition, it is helpful to bear in mind the origin and evolution of this branch of the law. It originated in the conscience, justice and equity of common-law judges. It developed, within the framework of a society dedicated to the freest competition, to deal with business malpractices offensive to the ethics of that society. The theoretic basis is obscure, but the birth and growth of this branch of the law is clear. It is a persuasive example of the law’s capacity for growth in response to the ethical, as well as the economic needs of society. As a result of this background, the legal concept of unfair competition has evolved as a broad and flexible doctrine with a capacity for further growth to meet changing conditions.
*431 There is no complete list of the activities which constitute unfair competition. The general principle, however, evolved from' all of the cases is that commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one person, of a benefit or property right belonging to another. (Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, affd. 279 App. Div. 632, supra; Handler, Unfair Competition, 21 Iowa L. Rev. 175; 1 Nims on Unfair Competition and Trade-Marks [4th ed., 1947], chs. I, II; Sehechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813.)
The statement of a sufficient cause of action in unfair competition in the last analysis is therefore dependent more upon the facts set forth, and less upon technical requirements than in most causes of action. For example, in the earlier cases, there was a requirement that the complaint set forth an allegation of ‘ ‘ palming off ’ ’. While there is, in effect, such an allegation in this complaint, even in the absence of such an allegation, there would not be a fatal defect in the complaint. It was thought that an allegation of ‘ ‘ palming off ’ ’ was required, that is, the fraudulent representation of the goods of the seller as those of another. The early decisions condemning this practice were based on the two wrongs inflicted thereby: (1) the deceit and fraud on the public; (2) the misappropriation to one person of the benefit of a name, reputation or business good will belonging to another. (Taylor v. Carpenter, 3 Story 458 [U. S. Circuit Ct., Mass., 1844]; Howard v. Henriques, 3 Sandf. 725 [1851].)
With the passage of those simple and halcyon days, when the chief business malpractice was “palming off”, and with the development of more complex business relationships and, unfortunately, malpractices, many courts, including the courts of this State, extended the doctrine of unfair competition beyond the cases of “ palming off ”. The extension resulted in the granting of relief in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or “ property right ” belonging to another.
The courts have used various formulae in making this extension. Many of the earlier of such decisions relied on the presence of special elements: For example, inducing breach of trust or breach of contract in misappropriating the property. (Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236; Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205; Sperry & Hutchinson Co. v. Mechanics’ Clothing Co., 128 F. *432 800.) However, in Fonotipia, Ltd. v. Bradley (171 F. 951) the Circuit Court, after reviewing these decisions, found there was unfair competition in a case of misappropriation even in the absence of any of the special factors. In that case the plaintiff had engaged artists and made recordings of their musical performance for sale to the public. The defendant obtained some of these recordings, mechanically reproduced them and sold the copies in competition with plaintiff’s records at much lower prices. The court posed the question as follows (p. 959): “whether the taking of property in the shape of valuable ideas and products, by mechanical imitation or reproduction, is susceptible of notice by a court of equity, and whether any remedy therefor can exist apart from the questions of patent, trade-mark, and intentional deception or imitation and deceitful substitution of the product.” It held (p. 964): ‘ ‘ It cannot now be determined how far such appropriation of ideas could be prevented; but it would seem that where a product is placed upon the market, under advertisement and statement that the substitute or imitating product is a duplicate of the original, and where the commercial value of the imitation lies in the fact that it takes advantage of and appropriates to itself the commercial qualities, reputation, and salable properties of the original, equity should grant relief.”
Subsequently, in 1918, the Supreme Court of the United States laid down a similar principle in International News Service v. Associated Press (248 U. S. 215). In that case the Associated Press sued to enjoin International News Service, among other things, from copying its news from bulletin boards and early editions of member newspapers and selling it bodily or in rewritten form to International News Service customers. The case presented particular difficulty because of the great public interest in the freest dissemination of the news. However, the court recognized that, as between the parties, even news was quasi-property.
In granting an injunction to the Associated Press against the pirating of its news the court held (p. 239 et seq.): “ The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant’s right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant — which is what defendant has done and seeks to justify — is a very different matter. In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure *433 of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant’s members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant’s legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business. * * * It is said that the elements of unfair competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant, characteristic of the most familiar, if not the most typical, cases of unfair competition. * * * But we cannot concede that the right to equitable relief is confined to that class of cases. In the present case the fraud upon complainant’s rights is more direct and obvious. Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it, therefore, as gwsi-property for the purposes of their business because they are both selling it as such, defendant’s conduct differs from the ordinary case of unfair competition in trade principally in this, that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant’s goods as its own.”
The significance and limits of this decision have been widely discussed. That it extended' the doctrine of unfair competition to cases based on misappropriation of property has been accepted by the leading authorities. Chief Justice Hughes in Schecter Corp. v. United States (295 U. S. 495, 531-532) stated: “ ‘ Unfair competition, ’ as known to the common law, is a limited concept. Primarily, and strictly, it relates to the palming off of one’s goods as those of a rival trader. * * * In recent years, its scope has been extended. It has been held to apply to misappropriation as well as misrepresentation, to the selling of another’s goods as one’s own, — to misappropriation of what equitably belongs to a competitor. International News Service v. Associated Press, 248 U. S. 215, 241, 242.”
*434 The doctrine of extending unfair competition beyond cases of “palming off” has similarly been recognized and applied by the courts of this State. (Allen Mfg. Co. v. Smith, 224 App. Div. 187; Mayer Pictures v. Pathe News, 235 App. Div. 774, explained in decision in Madison Square Garden Corp. v. Universal Pictures Co., 255 App. Div. 459; Mutual Broadcasting System v. Muzak Corp., 177 Misc. 489; Twentieth Century Sporting Club v. Transradio Press Service, 165 Misc. 71.)
In their endeavor to prevent unfair business practices, the courts have determined that it was unnecessary to the sufficiency of a complaint and to the granting of relief that it be alleged and established that the parties aré actual competitors. (Tiffany & Co. v. Tiffany Prods., 147 Misc. 679, affd. without opinion 237 App. Div. 801, affd. without opinion 262 N. Y. 482; Long’s Hat Stores Corp. v. Long’s Clothes, 224 App. Div. 497; Marvlo Mills v. Marvel Mills, 170 Misc. 770, affd. 258 App. Div. 715; Triangle Pubs. v. Rohrlich, 167 F. 2d 969; Yale Elec. Corp. v. Robertson, 26 F. 2d 972; Madison Square Garden Corp. v. Universal Pictures Co., supra; Maison Prunier v. Prunier’s Restaurant & Cafe, 159 Misc. 551 and cases cited therein.)
The modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality, and a court of equity will penetrate and restrain every guise resorted to by the wrongdoer. The courts have thus recognized that in the complex pattern of modern business relationships, persons in theoretically noncompetitive fields may, by unethical business practices, inflict as severe and reprehensible injuries upon others as can direct competitors. That defendants’ piratical conduct and practices have injured and will continue to injure plaintiffs admits of no serious challenge, and possible money damages furnishes no adequate remedy.
That such practices constitute unfair competition with plaintiffs is made abundantly clear by the allegations of the complaint which, for the purposes of this motion, must be deemed to be true. Plaintiffs derive income from the uniqueness of their designs, and from their reputation, and the defendants, without any payment to plaintiffs, have profited, to what extent need not here be determined, from their misappropriation, through fraud, of the skill of the plaintiffs. This constitutes unfair competition. (International News Service v. Associated Press, 248 U. S. 215, supra.)
*435 The New York courts have applied the rule in the Internal tional News Service case in such a wide variety of circumstances as to leave no doubt of their recognition that the effort to profit from the labor, skill, expenditures, name and reputation of others which appears in this case constitutes unfair competition which will be enjoined. (See, e.g., Fisher v. Star Co., 231 N. Y. 414, 428; Lehrenkrauss v. Universal Tours, 262 N. Y. 332, 337; Madison Square Garden Corp. v. Universal Pictures Co., 255 App. Div. 459, 464-465, supra; Federal Waste Paper Corp. v. Garment Center Capitol, 268 App. Div. 230, 234, affd. 294 N. Y. 714.)
The defendants raise the further objection that the complaint fails to state a cause of action in that it sets forth no property rights of the plaintiffs which had been interfered with. Clearly, some property rights in the plaintiffs and interference with and misappropriation of them by defendants are necessary to a cause of action. However, “property rights ”, as has often been pointed out, are rights which are recognized and protected by the courts by excluding others therefrom. The designation is therefore more in the nature of a legal conclusion than a description.
The rights which the plaintiffs allege in the amended complaint are:
(1) The creation of unique and valuable dress designs.
(2) Right of plaintiffs to exclusive use, directly or indirectly, of the name and reputation which they have developed over many years.
(3) The exclusive right of plaintiffs to the designs, models and sketches which they created by the use of their skill, money and the organizations they have developed.
(4) The exclusive right of plaintiffs to license the use of their unique and original designs and to sell their designs and models.
The question presented is thus whether these rights are rights which the courts have recognized and protected and should recognize and protect as “ property rights
The Court of Appeals in Fisher v. Star Co. (231 N. Y. 414, 429, supra) quoted with approval the broad definition of property rights laid down by the Supreme Court of the United States in the International News Service case (supra): “ ‘ The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right; and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. It *436 is this right that furnishes the basis of the jurisdiction in the ordinary ease of unfair competition. ’ ”
The right to the exclusive use of one’s own name and reputation has long been recognized by the courts, as evidenced by the early protection of trade-marks and trade names and the ‘ ‘ palming off ’ ’ cases.
The law has also, as Justice Brandéis pointed out in his dissent in the International News Service case (supra) protected the creative element in intellectual productions — that is the form of sequence of expression, the new combination of colors, sounds or words presented by the production. So, too, it would appear that the law would protect the creative element in the designing of garments where great skill and talent and ingenuity are employed.
In the Metropolitan Opera case (supra) the unauthorized recording of Metropolitan Opera broadcasts and sales of records thus obtained were enjoined. This court held that the Metropolitan had property rights in its performances which were not abandoned by performance broadcast or sale of records, all under exclusive contract, and that the misappropriation of these unabandoned rights constituted unfair competition. The defendant’s misappropriation was held to constitute an illegal interference with the Metropolitan’s contractual relations, and this alone was sufficient to bring the case within the rule against unfair competition.
The defendant in the Metropolitan Opera case advertised its records as Metropolitan Opera recordings. Yet this court held that this misappropriation and trading on the Metropolitan’s name and reputation were sufficient to constitute unfair competition. The decision of this court was affirmed by the Appellate Division which said (279 App. Div. 632, 633): “ Defendants’ acts, as alleged in the complaint, constitute a misappropriation of the work, skill, expenditure and goodwill of plaintiffs, and present a case of unfair competition.”
The unfairness required to sustain the cause of action for unfair competition is satisfied by any one of the allegations of the amended complaint by showing: that the defendants interfered with the plaintiffs’ valuable contractual relationships with their licensees (Metropolitan Opera Assn. v. Wagner-Nichols Recording Corp., supra); that they obtained entrance to the showings of plaintiffs by fraudulent representations, concealments and promises (Montegut v. Hickson, Inc., 178 App. Div. 94); that they violated their agreements upon entry of plaintiffs’ showings not to copy or reveal what they saw, Glass & Co. v. Art-Mor Togs (9 Misc 2d 339); that they obtained plaintiffs’ *437 designs by inducing plaintiffs ’ employees to violate confidential relations and contractual obligations with the plaintiffs (Spiselman v. Rabinowitz, 270 App. Div. 548); and finally that they traded on plaintiffs’ reputations and good will. (See Fisher v. Star Co., 231 N. Y. 414, supra; Mayer Pictures v. Pathe News, 235 App. Div. 774, supra; Mutual Broadcasting System v. Muzak Corp., 177 Misc. 489, supra.)
Further attack upon the amended complaint made by the moving defendant in support of his argument that the complaint fails to state a cause of action is that the plaintiffs have abandoned their rights by inviting certain individuals to attend the various showings, including certain members of the press. At common law the public performance of a play, exhibition of a picture or sale of a copy of the film for public presentation did not constitute an abandonment nor deprive the owner of his common-law rights. (Palmer v. De Witt, 47 N. Y. 532; Ferris v. Frohman, 223 U. S. 424; American Tobacco Co. v. Werckmeister, 207 U. S. 284; Universal Film Mfg. Co. v. Copperman, 218 F. 577.) In the International News Service case (248 U. S. 215, supra) the court in discussing this question of publication and abandonment stated (pp. 240-241): “ The contention that the news is abandoned to the public for all purposes when published in the first newspaper is untenable. Abandonment is a question of intent, and the entire organization of the Associated Press negatives such a purpose. The cost of the service would be prohibitive if the reward were to be so limited. * * * Their [by-laws] effect is that publication by each member must be deemed not by any means an abandonment of the news to the world for any and all purposes, but a publication for limited purposes; for the benefit of the readers of the bulletin or the newspaper as such; not for the purpose of making merchandise of it as news, with the result of depriving complainant’s other members of their reasonable opportunity to obtain just returns for their expenditures.”
The care with which plaintiffs protected their showings, the elaborate scheme devised for such protection, the method by which persons were admitted to: the showings clearly demonstrated the intent not to abandon, but on the contrary, an attempt to retain effective control over the reproduction, sale and copying of plaintiffs ’ original and unique designs. The publication in this case is certainly no wider nor more unlimited than the publication of news in the Associated Press member newspapers and bulletins which was held by the Supreme Court of the United States to constitute limited publication.
*438 To hold that the protection of plaintiffs’ property is lost at just the point at which the property becomes valuable and needs protection would be tantamount to holding that the property rights are not entitled to protection at all.
Furthermore, abandonment is a question of intent. (International News Service v. Associated Press, 248 U. S. 215, supra; American Tobacco Co. v. Werckmeister, 207 U. S. 284, supra; Metropolitan Opera Assn. v. Wagner-Nichols Recording Corp., 199 Misc. 786, 794, supra.)
This court, under very similar circumstances, has held exhibiting dress designs under limited conditions was not an abandonment. In the Henry Glass & Co. case (supra) it was held that exhibiting plaintiff’s design to the defendant in expectation of obtaining orders, the defendant agreeing as a condition of being shown the design not to copy or cause to be copied plaintiff’s patterns, was not a publication. The plaintiffs here have placed similar restrictions upon allowing anyone to see their designs, and therefore have not abandoned those designs.
The case of Board of Trade v. Christie Grain & Stock Co. (198 U. S. 236 [1905], supra), is squarely in point on this issue. In that case, Mr. Justice Holmes granted an injunction preventing the defendant from copying market quotations gathered by the plaintiff, and sold by the plaintiff to approved customers. The court held that communicating quotations to persons in confidential and contractual relations to the plaintiff under obligation not to copy or disclose was not publication, saying at pages 250-251: “ The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach.”
In the instant case, the plaintiffs lose no rights by showing their designs to persons who have agreed not to make public what they are shown.
The case of Varsity Sportswear v. Princess Fabrics Co. (174 Misc. 298) cited by defendant to indicate that designs and fashions are not entitled to protection because they are in the public domain, does not stand for the proposition for which it is cited. The case held that the copying by the defendant of the name of plaintiff’s line of dresses to describe similar dresses made by the defendant would be enjoined as unfair competition. The court said by way of dictum that an injunction would not have been granted on the basis of the copying alone by the *439 defendant’s dresses because the plaintiff had sold its dresses to the public without restriction. Since there was an unrestricted publication, plaintiff’s property rights were abandoned. The instant case in which there has been no unrestricted publication is clearly distinguishable even from the dictum of the Varsity case.
The case of Bristol v. Equitable Life Assur. Soc. (132 N. Y. 264) does not support the proposition that trade secrets are lost as soon as disclosed in any way. In the first place, the court in that case made clear that a trade secret is only lost if no steps are taken to protect it. The case has no application to the instant case in which the plaintiffs have taken elaborate precautions which are circumvented only by the tortious and wrongful acts of defendants. Second, one of the grounds upon which the decision in the Bristol case was decided was a finding that the defendant did not agree not to use the idea communicated to him by the plaintiff. In the instant case the co-conspirators of defendant Milton did agree, as a condition of entry to plaintiffs’ showings, not to communicate plaintiffs ’ designs.
The citation by defendant Milton of Nims’ Treatise on Unfair Competition (Vol. 1, §§ 141, 143) is misleading even as to the law on trade secrets expounded there. In addition to the quotations which the defendant uses, it is said in section 141, at page 404: ‘1 Appropriation of such ideas can be protected on the grounds of violation of confidence or of contract but such cases are not within the scope of this book.” And in section 143, at page 406: “The plaintiff does not lose its rights by communicating the results to persons, even if many in confidential relations to itself, under a contract not to make it public ’
Spiselman v. Rabinowitz (270 App. Div. 548, supra) shows that even as to a trade secret, the secret is not lost unless there is an unrestricted publication. In that case, the plaintiff had a contract with another party to produce beads using plaintiff’s secret ‘ ‘ pearlizing ’ ’ process, the contract containing a promise by that party not to reveal the process. The complaint stated that the defendant, knowing of this contract, obtained the process from the contractee and produced and sold beads using plaintiff’s process. A motion to dismiss the complaint for failure to state a cause of action was denied, the court holding that the revelation of the secret under these restricted conditions, similar to the conditions of plaintiffs’ contract in our case, was not a publication.
There is no reason apparent to this court why the rights of the plaintiffs should receive less protection than those of the *440 sponsor of sporting events and the disseminator of news. The law at least regards both of these diverse facets of human endeavor with impartial and approving judgment. Equity will not bear witness to such a travesty of justice; it will not countenance a state of moral and intellectual impotency. Equity will consider the interests of all parties coming within the arena of the dispute and admeasure the conflict in the scales of conscience and on the premise of honest commercial intercourse.
The complaint can also be sustained as stating a cause of action for unjustifiable interference with the contractual rights of the plaintiffs. With full knowledge of the elaborate plans made by the plaintiffs to protect their rights, the defendants have assumed the privilege of taking unto themselves that which the plaintiffs, by careful design, sought to protect in granting licenses to others to reproduce and copy designs. The defendants’ action not only constitutes an attempt to secure the very benefit which the plaintiffs attain through grants to others under contract, but also an interference with contractual relations which will be enjoined by a court of equity. (Reiner v. North American Newspaper Alliance, 259 N. Y. 250; Navarro v. Fiorita, 271 App. Div. 62, affd. 296 N. Y. 783; Gonzales v. Kentucky Derby Co., 197 App. Div. 277, affd. 233 N. Y. 607; Pittsburgh Athletic Co. v. KQV Broadcasting Co., 24 F. Supp. 490.) The rule enunciated in these cases has been aptly summed up in the Harvard Law Review (Vol. 41, pp. 731-732) as follows: 1 ‘ And today there is no question but that there may be prima facie liability for interference with contract relations without inducing breach of contract by, for example, injuring persons under contract so that they are disabled from performing, or by destroying or damaging property which is the subject matter of a contract, or by doing other acts which make performance more burdensome, difficult or impossible or of less or no value to the one entitled to performance.”
The present defendants’ conduct interferes with plaintiffs’ enjoyment of the benefit of the exclusive right which it has to license to others the right to copy and simulate plaintiffs’ original designs. The right of the parties to protect their interest in those contracts against interference by the intentional acts of third parties is not limited by the analogies of common-law property rights. This principle is affirmed in Gonzales v. Kentucky Derby Co. (supra) and Pittsburgh Athletic Co. v. KQV Broadcasting Co. (supra).
The final legal stand upon which the defendant moves for relief involves the claim, as pointed out earlier, that to enjoin *441 defendants would violate their right of free speech, freedom of the press, due process and would result in a restraint of trade. This court regards all of these arguments as without merit. It is difficult to follow the argument of the defendants or to determine how they bring this within the protection of the free speech and freedom of the press clause of the Constitution. To say that someone who by fraud and deception obtains the fruits of another’s labors and sells them commercially for his own advantage is acting as a disseminator of news and is therefore entitled to the constitutional protection would be a contorting of the Constitution beyond limits not even envisioned by the most radical protagonist of this salutary constitutional provision.
There is no parallel between the situation present in the instant case and the legal argument advanced by the defendants. In fact, restrictions against unfair competition by people who actually were engaged in dissemination of the news were upheld in Interantional News Service v. Associated Press (248 U. S. 215, supra); Board of Trade v. Christie Grain & Stock Co. (198 U. S. 236, supra) on the grounds that there is no right to steal the news that others have gathered.
Equally unavailing is the argument of the defendants that due process would be violated if an injunction were granted in this case. The court confessedly simply cannot follow this contention of the defendants.
Insofar as a claim is made relating to restraint of trade, there is nothing in the complaint to show this to be the fact. None of the plaintiffs has a monopoly of the fashion business or even a segment thereof, and no such inference can be drawn from the complaint. There is no showing that the plaintiffs have ever acted in concert to exclude anyone from the fashion field. Each acts individually to protect his own designs by not revealing them without restriction. The mere fact that the plaintiffs have joined together in this complaint does not mean that they are acting in concert in the manner and method contemplated by the cases relating to restraint of trade.
The activities of the plaintiffs do not involve a restraint of trade under the Sherman Anti-Trust Act (U. S. Code, tit. 15, §§ 1-7, 15), under section 340 of the New York General Business Law, or at common law. The law is well settled that an individual owner of property may do with his property what he pleases and may sell or not sell to whom he pleases. It is only a conspiracy to exclude competitors which is repugnant to the law. The case of United States v. Colgate & Co. (250 U. S. *442 300) is the leading case setting forth these principles. Times-Picayune Pub. Co. v. United States (345 U. S. 594) is a recent case reaffirming the principle that a refusal to deal with a particular individual by a single concern does not violate the Sherman Act.
Under section 340 of the General Business Law it has likewise been consistently held that an individual’s refusal to sell to anyone does not amount to prohibited restraint of trade. In Locker v. American Tobacco Co. (195 N. Y. 565) plaintiff brought an action alleging that the defendant, through its exclusive agent in New York, had refused to sell to it and that this constituted restraint of trade. The complaint was dismissed for failure to state a cause of action, the court saying- at page 566: “It is unquestionable that the owner of property may sell to whom he chooses, and equally he may control his agent. A refusal to sell to any particular individual becomes illegal only when it is done in pursuance of a combination with other owners to injure the individual with whom they refuse to deal. In other words, it is the combination of several persons which makes that action illegal which, if done by a single person without any agreement for joint action, would be legal. ’ ’
Two cases in which conspiracies to prevent style piracy were enjoined as restraints of trade are Fashion Originators Guild of America v. Federal Trade Comm. (114 F. 2d 80, affd. 312 U. S. 457) and Millinery Creditors’ Guild v. Federal Trade Comm. (109 F. 2d 175, affd. 312 U. S. 469). In both, of these cases fashion guilds prevented sale by their members to a list of style pirates prepared by the guilds, and members could he excluded from the guilds on the basis of sale to a concern on the lists. These cases are both distinguishable on the ground that a conspiracy involving a large portion of the fashion industry was involved. Furthermore, it was said in both cases that a conspiracy to prevent sale to retailers who appropriated unpublished designs would have been legal — it was only the fact that the conspiracy prevented sale to retailers who copied published designs as well as unpublished designs that made the conspiracy illegal. The facts in the instant case are otherwise.
Similarly, the case of Associated Press v. United States (326 U. S. 1) may be distinguished, on the basis that there a conspiracy was involved which included all papers subscribing to the Associated Press. The Associated Press by-laws prohibited service of news to nonmembers and empowered members to block membership applications of competitors and make them pay high fees for entering. It was held that this conspiracy *443 violated the Sherman Act since a new paper could be prevented arbitrarily from obtaining Associated Press news in competition with member papers in its area. In the present case there is no membership association which is blocking entry of anyone from competition. There is no concerted action by the plaintiffs at all. There is no conspiracy. The plaintiffs have not even refused to sell to defendants. The only thing sought to be enjoined is the defendants’ unfair appropriation of plaintiffs’ unpublished property.
The irreparable harm which of necessity must come to the plaintiffs by the acts of the defendants outweighs any financial loss which they may sustain resulting from their not being able to appropriate these designs for their own commercial benefit. Such injury as may be inflicted on the defendants is the direct result of their unconscionable business, practices and their invasion of the moral standards even of the market place. The defendants have embarked upon a hazardous enterprise which equity will not hesitate to strike down. Cast in its proper environment, we have here a business venture proposed to gather in the harvest, the seeds of which were planted and nurtured by others at great expense and with consummate skill.
The conclusion here reached is not an onslaught on the currents of competition; it does not impose shackles on the arteries of enterprise. It simply quarantines business conduct which is abhorrent to good conscience and the most elementary principles of law and equity.
Accordingly, the motion to dismiss the complaint and for other relief is in all respects denied.