**FURY IMPORTS, INC.,**
**Plaintiff-Appellee,**

v.

**SHAKESPEARE COMPANY,**
**Defendant-Appellant.**

**No. 78–2962.**

United States Court of Appeals,
Fifth Circuit.

Sept. 8, 1980.

John L. Britton, Frank J. Sinagra, Miami, Fla., Max Wildman, Chicago, Ill., Howard & Howard, James H. Geary, Kalamazoo, Mich., for defendant-appellant.

Corlett, Merritt, Killian & Mascaro, E. S. Corlett, III, Kenneth L. Ryskamp, Miami, Fla., for plaintiff-appellee.

Before RUBIN and POLITZ, Circuit Judges, and POINTER *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

This case comes before us for the second time. *See Fury Imports, Inc. v. Shakespeare Co.*, 544 F.2d 1376 (5th Cir. 1977). We need not again recite the facts there set forth at length, but we give a summary

* District Judge of the Northern District of Alabama sitting by designation.

sufficient to clarify the issues now before us.

Wiliam Ciaccia designed a fishing reel called the "Spinmaster" and formed a corporation, Fury Imports, to market it. Fury contracted with a Japanese manufacturer, Omori, to produce the reels. Omori was to sell the reels to its trading agent, Shinei Company. Shinei would in turn sell reels to Fury, which would be the exclusive distributor in the Western Hemisphere.

For the 1970 retail season, Fury was required to and did order 150,000 reels although a slightly smaller number was actually delivered. In June, 1970 Omori entered into a contract with Shakespeare, a competitor of Fury, agreeing to stop making Spinmaster reels for Fury within one year and to start making a similar reel for Shakespeare. The Shakespeare-Omori contract was not literally carried out, for Omori continued to make and deliver Spinmaster reels to Fury in 1971 and 1972, albeit in decreasing numbers. In 1973, Omori informed Fury that it would stop making Spinmaster reels. Fury filed this suit against Shakespeare on January 15, 1974.

The first appeal followed a jury trial, which resulted in a verdict for Fury. Shakespeare successfully moved for a judgment notwithstanding the verdict. We reversed the district court's judgment but remanded for a new trial on all issues including the defense that the statute of limitations had run on Fury's claim. With regard to that issue we said:

If the district court were to decide that the New York statute of limitation should have been applied, it will, of course, have to decide when Fury's cause of action accrued under New York law, and whether any reason exists for tolling the statute. Although the parties address much argument to us on these issues, we think it would be premature to pass on them at this point. This is especially so because there may well be issues of fact upon which a jury should pass as to just when the first breach occurred.

. . . We therefore do not rule on these issues.

554 F.2d at 1390.

The present appeal from the second jury verdict, awarding both compensatory and punitive damages, involves primarily two questions: (1) whether New York law or Japanese law governs the question of punitive damages and (2) when the statute of limitations began to run (that is, did it begin to run in June 1970, when the Omori-Shakespeare contract was made, or at a later time)?

## I. Punitive Damages.

■ Prior to the first trial, the parties entered into a stipulation that New York law would generally apply. The parties disagree over whether that stipulation extended to the issue of punitive damages.

We need not linger over the merits of this dispute since it has already been resolved. In our prior opinion we did not expressly decide which body of law controlled punitive damages. However, we implicitly adopted New York law as determinative. We said:

> The district court, stating that under New York law punitive damages may be recovered "where the wrong complained of is morally culpable, or . . . actuated by evil and reprehensible motives or a desire to harm the plaintiff, or where an act is so reckless that its carelessness indicates a heedless disregard of the rights of others," App. 60, nonetheless overturned the jury's verdict. On the evidence in this case, we think this was error.

554 F.2d at 1388. We then proceeded to discuss the New York cases, and concluded that the district court "erred in setting aside the jury award as to punitive damages," saying:

> Although we cannot be certain what the New York courts would do in a case like this, we do know that federal courts applying very similar law from other states have found the evidence sufficient to support awards of punitive damages in very similar inducement-to-breach cases. *Hannigan v. Sears, Roebuck and Co.*, 410 F.2d 285, 293–94 (7th Cir. 1969) *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969); *ABC–Paramount Records, Inc. v. Topps Record Distributing Co.*, 374 F.2d 455, 462–63 (5th Cir. 1967). We *think the same result should obtain under New York law here.*

554 F.2d at 1389 (emphasis supplied).

At the retrial, the district court again held that the stipulation required the application of New York law to decide whether or not punitive damages were allowable. In doing so he correctly followed our opinion. *See Schwartz v. NMS Industries, Inc.*, 575 F.2d 553, 554 (5th Cir. 1978).

## II. Statute of Limitations.

■ The parties agree that the New York statute of limitations controls. Under New York law, the period of limitations for tortious interference with a contract is three years. N.Y. Civ. Prac. § 214(4); *Von Ludwig v. Schiano*, 23 App.Div.2d 789, 258 N.Y.S.2d 661 (1965); *see Rolnick v. Rolnick*, 29 App.Div.2d 987, 290 N.Y.S.2d 111 (1968), *aff'd*, 24 N.Y.2d 805, 248 N.E.2d 442, 300 N.Y.S.2d 586 (1969); *Hanrihan v. Parker*, 19 Misc. 2d 467, 192 N.Y.S.2d 2 (1959). Whether or not it has run depends on when the cause of action accrued. The jury by special verdict found that "the first breach by Omori proximately caused by defendant Shakespeare Co.'s inducement" occurred after January 15, 1971, thus within three years of the date Fury filed this suit. There was sufficient evidence to support this finding.

Shakespeare nevertheless invites us to accept the simplistic idea that, because the eventual breach of Omori's contract with Fury arose "out of a meeting in Japan on June 10, 1970, between officials of Shakespeare's wholly-owned overseas subsidiary . . . and . . . [the] president of the Omori company," 554 F.2d at 1378, the cause of action accrued then as a matter of law. But neither life nor law is, fortunately, so simple. On that date, Fury could not have sued Omori for breach of contract for Omori had not yet failed in one iota of its contract obligations. Until there was a

breach of the Fury-Omori contract, fury could not sue Shakespeare for inducing its breach. As a recent opinion of the New York Court of Appeals states:

> In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party (*Israel v. Wood Dolson Co.* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99; *Campbell v. Gates*, 236 N.Y. 457, 141 N.E. 914; *Lamb v. Cheney & Son*, 227 N.Y. 418, 125 N.E. 817; 32 N.Y.Jur., Interference, § 20), a situation not here present.

*Jack L. Inselman & Co. v. FNB Financial Co.*, 41 N.Y.2d 1078, 1080, 364 N.E.2d 1119, 1120, 396 N.Y.S.2d 347, 349 (1977); *accord, Torrey Delivery, Inc. v. Chautauqua Truck Sales and Service, Inc.*, 47 App.Div. 279, 366 N.Y.S.2d 506 (1975).

Of course expressions can be found in New York opinions addressing another point, that "[t]he act of inducing the breach is the wrong . . . ." *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 156 (2d Cir. 1949). But inducing another to break a contract does not become a legal wrong upon which an action may be based until damage is suffered as a result, and that occurs only when the breach happens. *See Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 134 N.E.2d 97, 99, 151 N.Y.S.2d 1, 5 (1956). Shakespeare cites as authority to the contrary *Hagan Corp. v. Medical Society of New York*, 198 Misc. 207, 96 N.Y.S.2d 286 (Sup. Ct. 1950), aff'd, 279 App.Div. 1058, 113 N.Y.S.2d 282 (App. Div. 1952), and *Hanrihan v. Parker*, 19 Misc. 2d 467, 192 N.Y.S.2d 2 (Sup. Ct. 1959), but a closer reading reveals that in both of those cases there had been a breach of the contract prior to the date on which the court held the statute of limitations began to run.

■ A party who could be tempted to breach one contract might change his mind

and breach another. Omori might have disregarded its June 10th compact with Shakespeare and continued to deliver Spinmaster reels to Fury for ten years. If so, Fury would have had no cause of action against Shakespeare (or, for that matter, Omori). Indeed, with Shakespeare's apparent consent (because it did not need all of Omori's production), something akin to that happened: Omori did not perform the Shakespeare contract according to its literal terms since it did not terminate all shipments to Fury on the scheduled date. Omori breached its Fury contract for purposes of this action only when in response to Shakespeare's instigation it failed to deliver reels.[1] For the same reason, Omori's signing a contract with Shakespeare was not, per se, an anticipatory breach of the Omori-Fury contract.

In some instances, New York permits a claim for interference with contractual relations not constituting inducement to breach. Thus, a federal district court in New York recently said:

> It is not necessary, as plaintiff erroneously argues, to allege a breach of contract in order to state a valid claim for interference with contractual relations. The tort extends to cases in which performance of the contract is rendered more difficult or a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions. In New York, "an unlawful interference with a person in the performance of his contract with a third party is just as much a legal wrong as is an unlawful inducement of a breach of that contract by the third party."

*Goodall v. Columbia Ventures, Inc.*, 374 F.Supp. 1324, 1332 (S.D.N.Y. 1974) (quoting *Morris v. Blume*, 55 N.Y.S.2d 196, 199 (Sup. Ct.), aff'd, 269 App. Div. 832, 56 N.Y.S.2d 414 (App. Div. 1945); *see Dior v. Milton*, 9 Misc. 2d 425, 155 N.Y.S.2d 443, 460 (Sup.

---

1. Omori did not deliver all the reels that Fury ordered for 1970. There was, however, sufficient evidence that this failure was due to production problems, rather than to Shakespeare's promptings, to allow the jury to find, as it did, that there was no breach induced by Shakespeare in 1970. As we said in our prior opin-

ion, "Shakespeare can be held liable only for those breaches by Omori that it induced," 554 F.2d at 1388 n.16, and the trial judge so instructed the jury. The limitations period did not begin to run until Shakespeare's liability began.

Ct.), *aff'd*, 2 A.D.2d 878, 156 N.Y.S.2d 996 (App.Div. 1956); W. Prosser, Handbook of the Law of Torts 935 (4th ed. 1971).

■ That, however, is not the type of claim made here. Fury did not seek damages because Shakespeare made performance of its contract more difficult. It sued because Shakespeare induced Omori to break that contract. The amendment to Fury's complaint adding the claim now relevant alleged that Shakespeare "purposely designed to interfere with the contractual rights of plaintiff and ultimately to put the plaintiff out of business," and sought damages "for tortuous [sic] interference of the [sic] contractual rights." Fury's accompanying memorandum of law supporting its amendment makes clear that it sought damages for inducing Omori to cancel the contract, not for making performance more difficult. The memorandum alleges that Shakespeare's actions had the effect of "canceling out the plaintiff's contract with the Japanese factory that manufactured these Spinmaster reels." It is, therefore, not decisive that Fury may have known in August, 1970, that Shakespeare might be violating its exclusive distributorship, for that would not have given Fury a claim for inducing a breach of the contract to supply reels, the basis on which it sought damages.[2]

■ It was not reversible error for the trial court to exclude from the second trial as evidence bearing on when the claim arose the fact that Fury in the first trial claimed damages for 1970. Even if this legal theory of Fury's counsel was evidence having a tendency to make it more probable or less probable that the claim indeed arose before January 15, 1971, and so relevant

under rule 401 of the Federal Rules of Evidence, the trial judge was within his discretion in excluding it under rule 403, which allows the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See, e.g., United States v. Frick,* 588 F.2d 531, 537 (5th Cir. 1979); *United States v. McDaniel,* 574 F.2d 1224, 1227 (5th Cir. 1978).

Shakespeare briefly raises other points of error, but they are without merit. For these reasons, the judgment of the district court if AFFIRMED.

---

**2.** The judge instructed the jury at one point: The breach of the contract, however, does not have to be a breach in the legal sense. Rather, the tort extends to situations in which the performance of the contract is rendered more difficult. Where a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions. Nevertheless, since another element in the plaintiff's case is damages, the cause of action cannot accrue until the plaintiff has suffered damages for which he may be compensated.

His instructions as a whole, however, adequately convey that the plaintiff was suing for inducement to breach, not for making performance more difficult. In any case, even if this instruction is erroneous, it is erroneous in Shakespeare's favor, since it could possibly have persuaded the jury to find that the statute of limitations began to run even before there was an actual breach. Since the jury found for Fury on the limitations point, any error was harmless.