FLEXITIZED, INC., and Flexitized Sales Corporation, Plaintiffs-Appellees,

v.

NATIONAL FLEXITIZED CORPORA-TION and Dubin-Haskell Lining Corp., Defendants-Appellants.

No. 424, Docket 28739.

United States Court of Appeals Second Circuit.

Argued April 15, 1964.

Decided Aug. 3, 1964.

Hahn, Hessen, Margolis & Ryan, New York City (Robert J. Clerkin, New York City, of counsel), for plaintiffs-appellees.

Deane Ramey, New York City, for defendants-appellants.

Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.

WATERMAN, Circuit Judge.

This action involves a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq., together with claims of breach of contract and unfair competition. Jurisdiction rests upon 28 U.S.C. § 1338 and § 1332. 28 U.S.C. § 1338 grants to district courts original and exclusive jurisdiction over civil actions arising under any federal patent, copyright or trademark statute, and over any substantial and related claim for unfair competition which has been joined with such a statutory claim. 28 U.S.C. § 1332 grants jurisdiction in diversity of citizenship cases.[1]

1. Both plaintiffs are California corporations and both defendants are New York corporations.

Plaintiffs, two California corporations named Flexitized, Inc. and Flexitized Sales Corp. were organized in September of 1953 as the manufacturer entity and the sales agency entity in a business operation devoted to the production and marketing of a flexible collar stay which plaintiffs' principals had developed. The term "Flexitized" was coined by plaintiffs' principals shortly after their development of the stay and shortly before they organized plaintiff corporations and used the term in the corporate names. The essential characteristics of plaintiffs' collar stays is their capacity, when sewn into a collar, to retain a configuration or style shaped by the wearer; and an unsuccessful attempt was made sometime after the organization of plaintiff corporations to patent the stay. By February 1, 1955, however, plaintiff Flexitized, Inc. was successful in having "Flexitized" registered with the United States Patent Office as its trademark. In late 1953, plaintiffs, having already secured the services of a distributor for their stays in the West Coast area, entered into negotiations with defendant Dubin-Haskell Lining Corp., looking toward the latter's undertaking to distribute, either by itself or through an affiliate, plaintiffs' product in the Eastern part of the United States. As a result of these negotiations a series of letters was exchanged.

The first of such letters was sent under date of December 4, 1953 from the president of both plaintiffs to Herbert Haskell of defendant Dubin-Haskell Lining Corp. In it, plaintiffs' president referred to a conversation of that day between Herbert Haskell and him and set forth "the major terms" of an agreement said to be reached during such conversation, and expressed the hope that the letter would serve as legal protection for the parties until such time as plaintiffs' attorneys could draft a formal agreement. In his answering letter dated December 8, 1953, Herbert Haskell alluded to the "contractual agreement of December 4" and suggested certain modifications of the terms spelled out in the December 4

letter. He also stated that, "As we both thought, it would be a good idea to get your attorney to write up an agreement covering all these points as we agreed and forward same to us to make this legally official," adding that, "In the meantime, as per your statement, we will proceed and start working on this product immediately." Under the major terms of the agreement set forth in these letters, defendant Dubin-Haskell Lining Corp. was to become plaintiffs' exclusive distributor in all of the United States except eleven Western states, and during the five year life of the contract was not to have the right to sell any competing product, directly or indirectly. Only one other written communication passed between the two parties regarding the distributorship agreement. That was a letter dated December 17, 1953, in which plaintiffs' counsel, acting on his clients' behalf, stated to Herbert Haskell that he had been informed that Dubin-Haskell Lining Corp. in order to carry out distribution of plaintiffs' product was intending to form an affiliate using the name "Flexitized" and that he had suggested to plaintiff corporations' president that the use of the name "Flexitized" in the proposed corporation be conditioned upon the faithful performance of the distribution agreement. Defendant Dubin-Haskell Lining Corp. did not respond to this letter.

The proposed corporation referred to in this letter of December 17, 1953 did materialize shortly thereafter, it being organized under the name of National Flexitized Corp. in the early part of 1954, and becoming, eventually, the second defendant in this action. National Flexitized Corp., after its organization in 1954, began to be the distributor of plaintiffs' collar stays in the East, and from that time until the distributorship agreement was terminated both plaintiffs and defendants paid for the preparation and circulation of various advertising materials using the term "Flexitized." During 1954, 1955, and part of 1956, defendant National Flexitized Corp. purchased collar stays from plaintiffs for re-

sale to garment manufacturers at the rate of more than $100,000 per year, but sales by plaintiffs to National Flexitized fell off markedly in the latter part of 1956 and the early part of 1957. This drop in sales coincided with the selling, without plaintiffs' knowledge, by National Flexitized Corp. of collar stays which plaintiffs neither sold nor manufactured. In a letter to Herbert Haskell dated April 8, 1957, Henry Amber of plaintiff Flexitized Sales Corp., though not stating that plaintiffs had become aware that defendants were selling stays other than theirs, indicated that plaintiffs were going to attempt to sell their product through another means because defendants were "doing absolutely nothing with it" but stated that plaintiffs would continue to fill orders from defendants for another thirty days. Then, on July 16, 1957, plaintiffs' president wrote to Haskell informing him that plaintiffs had evidence that defendants were selling a competitive stay in violation of the agreement with plaintiffs, and that, although plaintiffs were willing to fill emergency orders until August 1, 1957, they had decided to terminate business relations with defendants. The letter also notified defendants immediately to discontinue using the name "Flexitized" in their operations. Thereafter defendant National Flexitized Corp. attempted to place an order by wire with the plaintiffs on August 1, 1957, but plaintiffs refused to fill it, explaining in a return wire and a covering letter that the refusal was for reasons stated in the letter of July 16. After termination of the agreement defendants continued to use the name "Flexitized" in the corporate name of defendant National Flexitized Corp. while marketing collar stays not made or sold by plaintiffs. Subsequently plaintiffs brought this action in the United States District Court for the Southern District of New York, claiming breach of contract, trademark infringement, and unfair competition. Plaintiffs' three claims were tried before the court, Tyler, J., and a jury, and, with the consent of the parties, the court took it

upon itself to resolve all issues pertaining to the claims of trademark infringement and unfair competition and left to the jury the task of determining the issues raised by the breach of contract claim.

On the basis of its own and the jury's findings, the lower court found that defendants did breach the contract and entered judgment for plaintiffs to recover $27,000 damages plus interest and costs; that plaintiffs' registered trademark "Flexitized" was invalid and dismissed the claim for trademark infringement; and, as to the claim for unfair competition, it permanently enjoined defendants from using the word "Flexitized" in their corporate name and in connection with their sale of products competitive with plaintiffs' products, but refused to order an accounting and assessment of profits made by defendants in connection with the use of "Flexitized" by them. The decision below is reported at 214 F.Supp. 664.

Defendants have appealed from the entry of judgment on the breach of contract and unfair competition claims, and plaintiffs have cross-appealed from the portion of the judgment declaring their trademark invalid and from the lower court's refusal on the unfair competition claim to order an accounting. We affirm the judgment below in all respects except the refusal by the lower court to grant plaintiffs an accounting on their claim for unfair competition, and, as to this portion of the judgment, we reverse and remand for such an accounting.

■■ We need give only brief attention to defendants' appeal on the breach of contract issue. The jury expressly found, and the trial court ruled that its findings were supported by adequate evidence, that plaintiffs and defendants had entered into an exclusive distributorship contract under which defendants promised to use their best efforts to sell plaintiffs' product and also promised not to sell a competing product during the life of the contract, that defendants had breached the contract, and that plaintiffs suffered resultant damages of $27,000.

Our examination of the record convinces us that there was ample evidence to support the verdict, both on the issue of liability and on the issue of damages, to which defendants have directed their principal efforts on appeal. The parties to this contract having entered into it contemplating the deriving of profits thereby, any loss of profits by plaintiffs resulting from defendants' breach, if such lost profits were established with reasonable certainty, were clearly recoverable under the governing law of New York. Cramer v. Grand Rapids Show Case Co., 223 N.Y. 63, 119 N.E. 227, 1 A.L.R. 154 (1918); Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 4 N. E. 264 (1885); Bagley v. Smith, 10 N. Y. 489, 61 Am.Dec. 756 (1854); Manuszewski v. Keele, 257 App.Div. 1036, 13 N.Y.S.2d 852 (4th Dep't 1939) (per curiam); Present v. Glazer, 225 App. Div. 23, 232 N.Y.S. 63 (4th Dep't 1928). Compare Witherbee v. Meyer, 155 N.Y. 446, 50 N.E. 58 (1898).

■■ Plaintiffs introduced evidence of their sales and profits before and after defendants' breach, clearly acceptable proof tending to show the amount of lost profits suffered by plaintiffs, Bagley v. Smith, supra; 5 Williston, Contracts § 1346A, at 3781 (rev. ed. 1937), cf. Present v. Glazer, supra, and plaintiffs also introduced evidence of defendants' collar stay sales and defendants' purchases from collar stay suppliers other than plaintiffs after the breach. Although such evidence did not establish damages in the form of lost profits precisely to the penny, it did suffice to form a reasonable basis upon which the jury could properly conclude the amount of plaintiffs' lost profits occasioned by defendants' breach, together with the amount of such profits which plaintiffs had been able to recoup through diligent efforts of their own after the breach had occurred. While there is some New York authority to the effect that evidence of a plaintiff's subsequent profits may not be introduced where damages are sought for lost profits from a contract breach that has delayed the commencement of a new business venture, see Cramer v. Grand Rapids Show Case Co., supra, such authority is of no aid to defendants in the case at bar. Here, prior to defendants' breach, plaintiffs and defendants had operated under the exclusive distributorship contract for a period of two full years during which plaintiffs had realized a fairly constant rate of profit from the venture. Thus, we conclude that there was adequate evidence to support the jury's findings that defendants were chargeable with a contract breach that had caused plaintiffs to suffer damages in the amount of $27,000.

■ We find equally undeserving of reversal the conclusion of the court below that plaintiffs' trademark, though registered, was invalid. While registration of a trademark is prima facie evidence of its validity, 15 U.S.C. § 1115(a), this merely gives rise to a rebuttable presumption, and the mark's validity may be attacked in a collateral proceeding. E. g., Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); National Nu-Grape Co. v. Guest, 164 F.2d 874 (10 Cir. 1947). It has been long established that a trademark is not valid if the terms comprising it, as understood in their normal and natural sense by those to whom the marked product is sought to be marketed, are merely descriptive of the product, or its ingredients, qualities or characteristics, and, absent a showing that the trademark through use has acquired a secondary meaning, it will not be accorded protection. 15 U.S.C. § 1052(e) (1); Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Kellogg Co. v. National Biscuit Co., supra; William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924); E. F. Drew & Co. v. Pam Industries, Inc., 299 F.2d 777 (7 Cir. 1962); Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694 (2 Cir. 1961); Douglas Laboratories Corp. v. Copper Tan, Inc., 210 F. 2d 453 (2 Cir.), cert. denied, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954); National Nu-Grape Co. v. Guest, su-

pra. That the terms used to comprise a trademark are misspelled, or represent the combination of several words or parts of words, or are otherwise so formed or malformed that the mark does not appear in any standard dictionary, will not preclude a finding of invalidity based on descriptiveness if the terms which are used, interpreted according to the basic rules of the English language, do sufficiently describe. See Armstrong Paint & Varnish Works v. Nu-Enamel Corp., supra; National Nu-Grape Co. v. Guest, supra; James Heddon's Sons v. Millsite Steel & Wire Works, Inc., 35 F.Supp. 169, 174 (E.D.Mich.1940), aff'd, 128 F.2d 6 (6 Cir.) cert. denied, 317 U.S. 764, 63 S.Ct. 79, 87 L.Ed. 541 (1942); 3 Callman, Unfair Competition and Trademarks §§ 71.1(c), 71.1(d).

■■ Applying these rules to plaintiffs' trademark "Flexitized," we conclude, as did the court below, that the mark is merely descriptive of the characteristics of the product marketed by the owner of the mark, a flexible collar stay capable of being molded to a desired shape. As the court below pointed out, the mark is a combination of the word "flex" and the suffix "ize." According to Webster's New International Dictionary (2d ed. 1961), "flex," used as a transitive verb, means "to bend." Used as a noun it means "the act or instance of bending or bowing." The suffix "ize," when affixed to a root, is said to create a verb meaning "to subject to the action, treatment or process denoted by the root," or "to render, make into, put into conformity with, or make like the thing, character, or quality denoted by the root." [2] Interpreting plaintiffs' trademark "Flexitized" in light of these definitions of its component parts, and according to the basic rules of English, we are of the opinion that the mark simply means "having been subjected to being bent," or "having been rendered bent," or "having been made into something bent," and, hence, is merely descriptive of plaintiffs' product. Moreover, construing "Flexitized" as having been formed by the root part of the adjective "flexible" and the suffix "ize," it must be interpreted as meaning "capable of being flexed, bent, or made pliable," and is thus further descriptive of plaintiffs' collar stay in light of its susceptibility to being shaped or molded by hand into a desirable style. Thus, we conclude that plaintiffs' trademark, though registered, was invalid, and as we also believe that the evidence amply supports the trial court's conclusion that "Flexitized" had acquired no secondary meaning, we affirm the dismissal of plaintiffs' claim for trademark infringement.

■ We come now to a consideration of plaintiffs' claim for unfair competition, and at the outset we must determine whether to apply the law of New York or federal law, for jurisdiction over this claim may be based not only upon diversity of citizenship of the parties but, as the unfair competition claim has been joined with a substantial and related claim for infringement of a federally registered trademark, may also be based upon the pendent jurisdiction provisions of 28 U.S.C. § 1338(b). We conclude, as did the trial court, that the applicable law is the law of New York.

In Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 540–541 (2 Cir. 1956), we had occasion to discuss in detail in a lengthy first footnote to that opinion, the law to be applied in adjudicating an unfair competition claim over which federal jurisdiction had been acquired only because of the pendent jurisdiction provisions of 28 U.S.C. § 1338 (b). Basing our conclusions there upon a synthesis of American Auto. Ass'n v. Spiegel, 205 F.2d 771 (2 Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 138, 98 L. Ed. 391 (1953), wherein the court held that the Lanham Act did not provide a federally created right of unfair competition, and Artype, Inc. v. Zappulla, 228 F.2d 695 (2 Cir. 1956), wherein this

2. The italics and parentheses used in the dictionary in setting forth these definitions have been eliminated.

court held that state law governed an unfair competition claim joined with a federal trademark claim where diversity of citizenship existed, we indicated in Maternally Yours that state law was properly to govern even where federal jurisdiction was pendent, for we noted that the source of the right sued upon, rather than the ground used to obtain federal jurisdiction, should determine the governing law. Although we stated in footnote 1 of Maternally Yours, Inc. that it was unnecessary at that time finally to dispose of the issues there discussed, we are now of the belief that, in light of our strong indication there set forth that state law was to govern even unfair competition claims that rested only upon pendent jurisdiction, and in light of the reasoning there set forth and the favorable discussion there undertaken of Artype v. Zappulla, supra, where, as here, federal jurisdiction rests both upon diversity of citizenship and pendent jurisdiction, state law ought to govern the result we reach.[3]

▇▇▇▇ It is clear to us that the evidence adduced below amply supported the trial court's finding that, as the law of unfair competition has developed in New York,[4] defendants' continued use of the word "Flexitized" after they had ceased to distribute plaintiffs' product made plaintiffs the victim of unfair competition, notwithstanding the fact that plaintiffs' mark had not yet acquired a secondary meaning as to either source or quality. Relief against unfair competition in cases like this is no longer limited in New York to situations where secondary meaning has been established so that a defendant can be charged with passing off his goods as those of another, but rather, as the result of doctrinal development in the wake of the United States Supreme Court's classic decision in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), relief has been granted in New York in a wide variety of situations to insure that "one may not misappropriate the results of the skill, expenditures and labors of a competitor," Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 567, 190 N.Y.S.2d 977, 986, 161 N.E.2d 197, 203 (1959). See Flint v. Oleet Jewelry Mfg. Co., 133 F.Supp. 459, 464 (SDNY 1955). A doctrine particularly developed in New York is that of granting relief upon the theory of the misappropriation of a property right or a commercial advantage of another, see Developments-Competitive Torts, 77 Harv.L.Rev. 888, 915, 935 (1964), and the New York courts have even determined that it is not essential to the granting of relief that the parties be shown to be in actual competition with each other. See Dior v. Milton, 9 Misc.2d 425, 155 N.Y.S.2d 443, 454 (Sup.Ct.N.Y.Cty.), aff'd mem., 2 App.Div.2d 878, 156 N.Y.S. 2d 996 (1st Dep't 1956), and cases there cited. As the court said in Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, 489 (Sup.Ct.N.Y.Cty.1950), in a statement which was to be repeated later in Dior v. Milton, supra, 155 N.Y.S.2d at

3. Although, because of the interstate nature of plaintiffs' and defendants' businesses, the acts of unfair competition complained of resulted in injury in many states outside New York, we conclude that, according to New York's conflicts of laws rules, the substantive law governing the case is that of New York. See Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A. L.R.2d 1 (1963); Swift & Co. v. Bankers Trust Co., 280 N.Y. 135, 19 N.E.2d 992 (1939).

4. We do not read the recent U. S. Supreme Court decision in Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S. Ct. 784, 11 L.Ed.2d 661 (1964), as establishing any constitutional bar to the application of state law in the instant case. The Court in the Sears Roebuck & Co. case merely held that states cannot, under the guise of regulating unfair competition, grant what is in effect patent protection, and the Court expressly stated that states "may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods." 84 S.Ct. at 789.

452: "With the passage of those simple and halcyon days, when the chief business malpractice was 'palming off', and with the development of more complex business relationships and, unfortunately, malpractices, many courts, including the courts of this State, extended the doctrine of unfair competition beyond the cases of 'palming off'. The extension resulted in the granting of relief in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or 'property right' belonging to another." Particularly where the defendant's conduct has involved a clear attempt to profit at the expense of the plaintiff, Electrolux Corp. v. Val-Worth, Inc., supra; Reiner v. North American Newspaper Alliance, 259 N.Y. 250, 181 N.E. 561, 83 A.L.R. 23 (1932); Madison Square Garden Corp. v. Universal Pictures Co., 255 App.Div. 459, 7 N.Y.S.2d 845 (1st Dep't 1938); see Playland Holding Corp. v. Playland Center, Inc., 1 N.Y. 2d 300, 152 N.Y.S.2d 462, 135 N.E.2d 204 (1956), or a breach of confidence by the defendant, Reiner v. North American Newspaper Alliance, supra; Dior v. Milton, supra; Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., supra, New York courts have deemed the conduct to be unfair competition despite the fact that plaintiff's mark has not acquired a secondary meaning. Our Court explicitly recognized in Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F. 2d 569, 571 (2 Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960), that, according to New York law, relief without a showing of secondary meaning is appropriate under such circumstances.

■ In the case at bar, the court below expressly found that, while plaintiffs had not succeeded in imbuing the name "Flexitized" with a secondary meaning, the name had nevertheless acquired a familiarity among prospective purchasers of collar stays or garments containing them which made such prospective buyers more likely to purchase items called "Flexitized" because of that name in connection with them. Also, the defendants' conduct in continuing to use, without plaintiffs' permission, the name "Flexitized" after its contract breach was expressly found to have been the result of a deliberate attempt to exploit purchaser familiarity with the name, and, as is clear from our prior discussion of the breach of contract claim in this case, such conduct by defendants was also directly connected with a breach on their part of a fiduciary relationship which had arisen upon their becoming exclusive sales agents for plaintiffs. Under these circumstances we think that defendants were properly chargeable with having misappropriated a valuable property right or commercial benefit under circumstances meriting a finding of unfair competition according to the law of New York, and the trial court was therefore correct in permanently enjoining such conduct by defendants.

■ Plaintiffs requested, however, yet additional relief, an accounting of profits to recover damages sustained through defendants' use of the word "Flexitized" in connection with goods competitive with those of plaintiffs after the date upon which the breached distributorship agreement was to end,[5] but the trial court refused to order such an accounting. We think that this was error. Although the lower court noted that it had been unable to find any New York case authorizing the ordering of an accounting in analogous circumstances, we are of the view that, if plaintiffs are able to establish their sought-for lost profits

5. Lost profits resulting from defendants' use of the name "Flexitized" after the breach and during the five-year contract period were within the damages recovered by plaintiffs on the breach of contract claim. Plaintiffs' request for an accounting is for the purpose of recovering profits subsequently lost due to defendants' wrongful use of the name "Flexitized" after the running of the contract period, when such use constituted unfair competition but was not in breach of any contract.

with reasonable certainty, nothing in the case law of New York prevents the granting of accounting relief. Indeed there is some authority in New York which can be construed as at least tacit approval of the granting of such relief in circumstances like these, as in Madison Square Garden Corp. v. Universal Pictures Corp., supra, where the court, although expressly dealing only with the merits of an unfair competition claim, upheld the sufficiency of a complaint wherein an injunction, an accounting and damages were all sought, without indicating that any one of the desired forms of relief would be improper. And in those cases where accounting relief has been denied, no lost profits or like damages recoverable through an accounting were apparently proven. Thus, in Electrolux Corp. v. Val-Worth, Inc., supra, the New York Court of Appeals based its refusal to grant an accounting on the ground that, under the particular circumstances of that case, there was no indication that purchases from the defendant represented losses of sales by the plaintiff, the court there finding that the damage that resulted from the defendant's unfair competition had been chiefly to plaintiff's good name and reputation. A remand was ordered to give plaintiff a chance to prove such damage to its business, despite the court's expressed belief that the amount of such damages would be very difficult to prove. That the court was of the opinion that the remedy of an accounting was not, however, to be foreclosed in all cases of unfair competition accomplished through misappropriation was made clear by its statement, quoting Roman Silversmiths v. Hampshire Silver Co., 282 App.Div. 21, 27, 121 N.Y.S.2d 329, 335 (1st Dep't 1953), aff'd per curiam, 306 N.Y. 894, 119 N.E.2d 593 (1954), made in connection with its discussion of the appropriateness of the accounting remedy, that, "What is true of all actions, is especially true in a suit for unfair competition: disposition of each case peculiarly depends upon the precise state of facts disclosed." 6 N.Y. 2d at 571, 190 N.Y.S.2d at 989, 161 N.E.

2d at 206. In the case at bar the evil of the conduct found to constitute unfair competition was not merely resultant injury to plaintiffs' good name and reputation. Rather, the trial court expressly found—and based its ruling that unfair competition had been engaged in on this very finding—that plaintiffs' name "Flexitized" had acquired a public familiarity which made prospective purchasers more likely to buy products connected with that name, and that defendants had unfairly competed by misappropriating this public familiarity. Thus, defendants by misappropriating to their own use something of plaintiffs which made prospective purchasers more likely to buy a product like plaintiffs' must have wrongfully caused plaintiffs to suffer losses of sales, and hence losses of profits, which, if provable in amount, ought to be recoverable. Therefore, plaintiffs on remand should be permitted to recover any lost profits they can establish they have suffered.

Reversed and remanded for further proceedings not inconsistent with this opinion.