**UNION CARBIDE CORPORATION, a corporation, Plaintiff,**

v.

**EVER–READY INCORPORATED, a corporation, and Mark Gilbert, an Individual, Defendants.**

**No. 71 C 3151.**

United States District Court, N. D. Illinois, E. D.

Feb. 18, 1975.

Walter J. Halliday, Halliday & Whitman, Rockville Centre, N. Y., Nims, Howes, Collison & Isner, New York City, John H. Morrison, Kirkland & Ellis, Thomas F. Gardner, Chicago, Ill., for plaintiff.

McConnell & Campbell, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MARSHALL, District Judge.

This is an action for trademark infringement and unfair competition brought by the plaintiff, Union Carbide

Corporation (hereafter "Carbide"), pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq., and the Illinois Trademark Act, Ill.Rev.Stat.1973, ch. 140, § 8 et seq.[1] Jurisdiction is founded upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1332 and 1338.

The defendants Ever-Ready Incorporated, by change of name Ever-Ready International Ltd. (hereafter "Ever-Ready"), and Mark Gilbert (hereafter "Gilbert"), have asserted the affirmative defenses of laches and misuse of trademark in violation of the anti-trust laws. Prior to trial, the anti-trust misuse issues were severed pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. Consequently, presently ready for decision are the issues of trademark infringement, unfair competition and laches.

Carbide is a New York corporation authorized to do business in Illinois with its principal place of business in New York. Ever-Ready is an Illinois corporation having its principal place of business in Chicago. Gilbert, a resident of Illinois, is the President, a Director and the General Manager of Ever-Ready. The matter is controversy, exclusive of interest and costs, exceeds the sum of $10,000.

In 1898 Carbide's predecessor, American Electrical Novelty and Manufacturing Company (hereafter "AEN&M") adopted the term EVER READY as a means of distinguishing its electrical appliance products from the products of others. In July, 1901, AEN&M originated and adopted as a trademark a device which included a monogram consisting of the letters "E" and "R", the word EVEREADY and the words THE FAMOUS EVER READY BATTERY.

On April 7, 1909, the corporate name of AEN&M was changed to American Ever Ready Company. The business, property and assets of American Ever Ready Company, including its trademarks, trade names and goodwill, were assigned and transferred in 1914 to Carbide's predecessor, the National Carbon Company.

Carbide and its predecessors have been engaged continuously since 1909 in manufacturing, distributing and selling throughout the United States batteries, flashlights and miniature lamp bulbs under the trademark EVEREADY, alone and in combination with other words and distinctive designs, including octagonal and hexagonal devices. Today Carbide is the owner of five United States trademark registrations of the trademark EVEREADY. Each trademark is in full force and effect, and affidavits for each have been filed pursuant to 15 U.S.C. §§ 1058 and 1065. Presently, Carbide is selling under its trademark EVEREADY electric flashlights, miniature bulbs for automobile and marine use only and an extensive line of electric batteries.

Since 1966, Carbide's annual sales of flashlights, batteries, miniature bulbs and related products under its trademark EVEREADY, have exceeded $100 million. In addition, Carbide has advertised extensively throughout the years its batteries, flashlights and miniature bulbs under its trademark EVEREADY in magazines and in other periodicals, on radio and television and through point of sale displays. Its advertising has featured inter alia, dramatizations of emergencies overcome as a result of the dependability, durability and long-lasting qualities of Carbide's products sold under its trademark EVEREADY. Carbide's total expenditures for advertising and promoting the sales of its products under the trademark EVEREADY from 1943 to 1974 exceed $50 million.

Defendant Gilbert began doing business in 1944 as Ever-Ready Florescent Company. In 1946, he and his wife

1. Appended to Carbide's primary trademark infringement and unfair competition claims is a dilution claim brought pursuant to the Illinois Trademark Act, Ill.Rev.Stat.1973, ch. 140, § 22, which provides for injunctive relief to protect against "dilution of the distinctive quality of the mark."

formed a partnership called Ever-Ready Electric Company, the business of which was to distribute electrical products and gift goods. Ever-Ready was incorporated as an Illinois corporation on February 25, 1952 under the name Ever-Ready Electric Supply Company and succeeded to the business of Ever-Ready Electric Company. Thereafter, the name Ever-Ready Electric Supply Company was changed to Ever-Ready, Incorporated, in 1955, and to Ever-Ready International, Ltd., in 1972.

Essentially, Ever-Ready is an importer and distributor of electrical supplies, stationery, gift items and accessories including lamps, light bulbs, light fixtures and flashlights. It conducts business under the trade name "Ever-Ready" alone and in combination with a logo design.

Ever-Ready imports from Japan miniature lamp bulbs having the term "Ever-Ready" stamped on their base. Thereafter, Ever-Ready sells the miniature lamp bulbs at wholesale for resale by retailers. The bulbs are sold in blister packages. Each blister pack, intended to be displayed by retailers at the point of sale, contains two bulbs and displays the term "Ever-Ready" in a four-sided logo, the words "high intensity minibulbs" and the legend, "(C) 1970 Ever-Ready, Inc., Chicago, Illinois 60607."

Ever-Ready imports high-intensity lamps manufactured in Japan bearing the term "Ever-Ready" stamped on the lamps or on removable labels attached thereto and desk lamps manufactured in Denmark with tags bearing the term "Ever-Ready" attached thereto. The desk lamps are sold with literature having the term "Ever-Ready" displayed thereon and with guarantee cards addressed to Ever-Ready Service Center. Appearing on all the lamps sold by Ever-Ready, however, is the name of the manufacturer.

Carbide seeks an injunction against Ever-Ready's use of the term "Ever-Ready" on and in connection with the advertising, offering for sale and sale of electrical products. Carbide also requests that Ever-Ready be required to deliver up to it the packaging and promotional material bearing the alleged infringing words and symbols.[2]

## I. TRADEMARK INFRINGEMENT

Section 32(1)(a) of the Lanham Act provides:

"(1) Any person who shall, without consent of the [trademark] registrant —

"(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive . . .

shall be liable in a civil action by the [trademark] registrant . . . ." 15 U.S.C. § 1114(1)(a).

Section 45 of the Act defines "colorable imitation" as:

". . . any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." 15 U.S.C. § 1127.

The gravamina of an action for federal trademark infringement are (1) that the trademark owner owns a currently valid federal trademark registration for his mark and (2) that the infringer uses a mark likely to cause confusion, mistake or to deceive in interstate commerce. In the present case the parties have stipulated that Carbide is the owner of the mark EVEREADY[3] and the evidence shows that Ever-Ready uses the term "Ever-Ready" in interstate commerce. Consequently, the validity of Carbide's mark and the likelihood of confusion caused by Ever-

---

2. Carbide does not seek damages or an accounting of Ever-Ready's profits.

3. Stipulation of Uncontested Facts, ¶ 6.

Ready's mark are the remaining issues to be resolved on the trademark infringement question.

## A. VALIDITY

■ *Presumption of Validity.* Under Section 7(b) of the Lanham Act, 15 U. S.C. § 1057(b), registration of a mark is "prima facie evidence" of (1) the validity of the registration, (2) the registrant's ownership of the mark and (3) the registrant's exclusive right to use the mark in commerce under the specified conditions and limitations of the registration. Thus, registration of a mark creates a presumption of validity, which is entitled to considerable weight. Miss Universe, Inc. v. Patricelli, 408 F. 2d 506, 509 (2d Cir. 1969). The presumption of the trademark's validity, however, is rebuttable, with the burden on the party attacking the mark or its registration. Schwinn Bicycle Co. v. Murray Ohio Mfg. Co., 470 F.2d 975, 977 (6th Cir. 1972).

Here there is no dispute that Carbide registered its mark EVEREADY. Consequently, Carbide's mark is presumed valid.

■ *Descriptive Term.* Section 2(e) of the Lanham Act, 15 U.S.C. § 1052(e) provides in material part:

"No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

\* \* \* \* \* \*

"(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive of them . . .."

Succinctly, descriptive terms are not subject to trademark protection.[4] Clearly, then, where descriptive terms are used, the presumption of validity is rebutted. Shaw-Barton, Inc. v. John

Baumgarth Co., 313 F.2d 167 (7th Cir. 1963); John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314 (7th Cir. 1961).

Ever-Ready argues that Carbide's mark is descriptive only of the products to which it is attached and hence, is not protected by the trademark laws.

■ The nature of the term, the common and ordinary meaning of the term to the public and the relationship the term bears to the particular product determine whether the term is descriptive. If the term conveys to the public the characteristics, quality, functions or other attributes of a product, it is descriptive. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924); Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774 (2d Cir. 1964). Terms which describe the desirable aspects of a product, how a product functions or what the product looks like are descriptive. Quaker State Oil Refining Corp. v. Quaker Oil Corp., 453 F.2d 1296 (CCPA, 1972) (the term SUPER BLEND held descriptive of multiviscosity oils, because the conclusion is inescapable that the product is an allegedly superior blend of oils); Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F.Supp. 129 (S.D.N.Y.1972) (the term Tender Vittles only a descriptive term because the unique characteristic of the product [cat food] and the quality which sets it apart from other non-canned cat foods is that characteristic which is conveyed by the words "tender vittles"); S.M. Flickinger Co. v. Beatrice Foods Co., 174 U.S.P.Q. 51 (T.T. A.B.1972) (the term SUPER DUPER entitled only to a limited protection since it is a commonly used expression which signifies great excellence, size or the like).

Here Carbide and Ever-Ready sell a number of electrical products. Batteries, flashlights, lamps and miniature bulbs are among the products sold by ei-

---

4. Since descriptive terms describe merely the goods to which they are attached, they do not perform the essential trademark function of identifying the source of the goods and distinguishing them from the goods of others. Hence, the statutory exclusion. Artype, Inc. v. Zappulla, 228 F.2d 695 (2d Cir. 1956).

ther Carbide or Ever-Ready. The mark at issue consists of two words "ever" and "ready". According to The American Heritage Dictionary of the English Language (1969), the primary meaning of the word "ever" is: "at all times; constantly, repeatedly." The same dictionary defines the word "ready" as "prepared or available for service or action." Thus, the combination of "ever" and "ready" means constantly prepared or available for service. Those words as they relate to the products sold by the parties describe a characteristic or attribute of the products. Indeed, Carbide's national advertising in magazines and trade journals, on radio and television and through point of sale displays has featured dramatizations of emergencies overcome as a result of the dependability, durability and long-lasting qualities of the products sold under the mark EVEREADY.

Other uses of the words "ever" and "ready" in connection with various products and services manifests the intended descriptiveness of them. For example, Ever-Ready introduced into evidence advertisements of "Ever-Ready Oil", "Ever-Ready Calendars", "Everedy Housewares", "Ever Ready Mailing Lists", the "Ever-Ready Shaving Brush" and the "everedy Koke-Toter" [cake server and carrier]. Defendant's Exhibits Nos. 119, 120, 123, 124, 125 and 127.[5]

■ On the other hand, descriptive terms must be distinguished from suggestive terms, since the latter are

protected by the federal trademark laws. Watkins Prods. Inc. v. Sunway Fruit Prods., Inc., 311 F.2d 496 (7th Cir. 1962). Suggestive terms "suggest", but do not describe the qualities of a particular product. The distinction threatens to be one without a difference. Essentially, however, the common and ordinary meaning of the term to the public and the incongruous use of it as it relates to the product determine whether a term is suggestive. General Shoe Corporation v. Rosen, 111 F.2d 95, rhg. denied, 112 F.2d 561 (4th Cir. 1940) ("[Suggestive] terms . . . shed some light upon the characteristics of the goods, but so applied they involve an element of incongruity and in order to be understood as descriptive, they must be taken in a suggestive or figurative sense through an effort of the imagination on the part of the observer"); W. G. Reardon Laboratories, Inc. v. B & B Exterminators, Inc., 71 F.2d 515 (4th Cir. 1934) (holding that the term MOUSE SEED for rat poison suggested that the product consists of small seeds which exterminate rodents and did not describe seeds which grow mice)·; Stewart Paint Mfg. Co. v. United Hardware Distributing Co., 253 F.2d 568 ·(8th Cir. 1958) (holding the term Flint-Top for paint did not describe a paint with a top made of flint but suggested that the paint, when dry, had a hard surface).

■■ The terms "ever" and "ready" *as they relate to electrical products do not come within the "suggestive" classification.*[6]

5. While these third party uses of the terms "ever" and "ready" involved goods or services which are unrelated to electrical products, they are illustrative of the descriptive nature of the terms.

6. See 1 Nims' Unfair Competition and Trade-Marks, § 201 (1947), wherein it is stated:
 "A practical test [of whether a term is descriptive] is to inquire whether giving to the plaintiff the right to appropriate the word as his trade-mark in any way 'restricts others from properly describing similar articles produced by them. . .' In some cases where trade-marks

have been held to be invalid, the courts have pointed out the words claimed as trade-marks are the only words or the most appropriate words by which ·the goods can be named or described. Where recognition of trade-mark rights would deprive competitors of the only or best means of naming and describing their wares there can be no doubt as to the invalidity of the claimed trade-mark . . . .. Competitors have a right to use any and all words which, though not absolutely necessary, may appropriately and honestly be used, in their normal sense, with reference to the goods."

Two cases are troublesome. In Independent Nail & Pack Co. v. Stronghold Screw Products, Inc., 205 F.2d 921 (7th Cir. 1953), the Court of Appeals for the Seventh Circuit held that the mark Stronghold was not descriptive but suggestive when used in connection with nails. The defendant argued that the mark referred to the superior holding power of a nail manufactured by the plaintiff and consequently was descriptive. In rejecting the argument, the court stated in material part:

> "Although the word 'Stronghold' is suggestive of one of the attributes of plaintiff's nail . . ., it is not descriptive of a nail, let alone that type of nail. A person unaware of the particular product, or the manufacturer, upon seeing or hearing the name 'Stronghold' would find it virtually impossible to identify the product to which it might have been applied. The label 'Stronghold' on a carton, with no other words to designate the contents, would never reveal that the contents were nails of a particular type." 205 F.2d at 925.

If by this the court meant to hold that in order to be descriptive a term must identify, at least impliedly, the product, I disagree. Describing a characteristic, a quality or an attribute of the product is sufficient. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L. Ed. 1161 (1924). To hold otherwise would mean that words like "Superior", "Best" and "Super", all of which claim merely the excellence of a product, would be considered suggestive. Indeed, under this view only nouns could be considered descriptive. The consequence would make the exclusion of generally descriptive terms from trademark protection meaningless.[7]

There was, however, an additional factor in Stronghold that is not present here. The defendant in Stronghold, when threatened with litigation, registered its Stronghold mark in 46 states. The court emphasized that the defendant was in a weak position to assert the descriptiveness of the term in light of its prior conduct. 205 F.2d at 926.

Watkins Products, Inc. v. Sunway Fruit Products, 311 F.2d 496 (7th Cir. 1962) was a case which arose initially from a Patent Office trademark cancellation proceeding.[8] The Trademark Trial and Appeal Board held unanimously that the mark FRESHIE, registered in 1944 for use in connection with beverage bases for soft drinks, was entitled to trademark protection; that confusion was likely to arise from the concurrent use of FRESH-AID or FRESH-AIDE and FRESHIE and that the registrations of FRESH-AID and FRESH-AIDE, obtained in 1957, were cancelled.

An appeal to the district court ensued. That court reversed the Board and found that FRESHIE was a descriptive term when used in connection with beverage bases for soft drinks. The Court of Appeals for the Seventh Circuit, reversing the district court, found that FRESHIE was entitled to protection but emphasized:

> "It should be kept in mind that the instant case did not arise in the District Court. This was a Patent Office cancellation proceeding. The role of the District Court is different in this kind of proceeding than a case where a suit involving the validity of a trademark is originally commenced in

---

Arguably the words "ever" and "ready" are particularly appropriate for service goods such as electrical products. Consequently, they should not be entitled to trademark protection. See also, Minnesota Mining & Mfg. Co. v. Johnson & Johnson, 454 F.2d 1179, 1180 (CCPA 1972).

7. Certainly, there is nothing incongruous in the use of the term "Stronghold" for describing nails.

The briefs submitted to the Court of Appeals in Stronghold did not raise the "incongruity requirement" for suggestive terms.

8. This proceeding results from a petition being filed with the Patent Office objecting to the use of a mark and requesting cancellation of the objectionable mark's registration.

the District Court . . . 'a finding of fact by the Patent Office . . . must be accepted as controlling, unless the contrary is established by evidence . . . a mere preponderance of the evidence is not sufficient . . . .'" 311 F.2d at 498–99.

*Watkins* is not this case.

When the mark EVEREADY is applied to the electrical products sold by Carbide, the conclusion is inescapable that the products are dependable and durable. Accordingly, I find that Carbide's mark EVEREADY is descriptive and within the purview of § 2(e) of the Lanham Act. 15 U.S.C. § 1052(e).

*Secondary Meaning.* Carbide argues that assuming *arguendo* EVEREADY is a descriptive term, it is still entitled to trademark protection since it has acquired secondary meaning.

 A descriptive term may be protected as a trademark if it has secondary meaning. It acquires secondary meaning through usage on a product so that it signifies to the public that the product is produced by a particular source. 1 Nims, Unfair Competition and Trademarks, § 37 (1947). Simply stated, the primary significance of the term to the public must be the producer, so that the public associates the goods designated by the mark with a particular source. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); Keller Prods., Inc. v. Rubber Linings Corp., 213 F.2d 382 (7th Cir. 1954).[9]

 Proof of secondary meaning must satisfy rigorous "evidentiary requirements." Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F.Supp. at 133. Consequently, the burden of proving secondary meaning which is on the party asserting it, Keller Prods., Inc. v. Rubber Linings Corp., 213 F.2d at 386, is necessarily "substantial." Aloe Creme Laboratories, Inc. v. Milsan, Inc., 423 F.2d 845 (5th Cir. 1970), cert. denied 398 U.S. 928, 90 S.Ct. 1818, 26 L. Ed.2d 90 (1970).

 Relevant factors on the issue of secondary meaning are: the amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys. See Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F.Supp. at 134 ("The term in question must have been 'used in such a manner, over such a period of time, and to such an extent that the purchasing public associates' it with the goods of a particular source"); Sun Valley Mfg. Co. v. Sun Valley Togs, Inc., 39 F.Supp. 502, 503–04 (S.D.N.Y.1941) ("The elements to be considered in determining whether a name has acquired a secondary meaning are generally (a) length of use of such name, (b) the nature and extent of popularizing and advertising such name, (c) the efforts in promoting the consciousness of the public in connecting that name with a particular product").

The evidence shows that Carbide and its predecessors have distributed and sold electrical products under the EVEREADY mark since 1909; that in 1915 10 million dry cell batteries marked EVEREADY alone were sold with an advertising cost of approximately $225,000; that Carbide's sales of electrical products under the EVEREADY mark from 1963 to 1973 exceeded $100,000,000 each year; that during the 1963–1973 period Carbide advertised in magazines and trade journals, on radio and television and through point of sale displays and that the cost of the 1963–1967 advertising was $50,000,000.

9. Section 2(f) of the Lanham Act provides in material part:
". . . nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce." 15 U.S.C. § 1052(f).

Essentially, section 2(f) provides that when a non-distinctive designation, e. g., a descriptive term, has become distinctive of the producer's goods in commerce, it is subject to trademark protection. Seemingly, "secondary meaning" and "distinctiveness" are synonymous.

■ But length of use and volume of sales alone cannot establish secondary meaning. Moreover, the cost of advertising does not establish the success of it but merely the efforts to establish secondary meaning. Aloe Creme Laboratories, Inc. v. Milsan, Inc., 423 F.2d at 850; Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F.Supp. at 134. Indeed, short of a survey, secondary meaning is difficult of direct proof. Aloe Creme Laboratories, Inc. v. Milsan, Inc., 423 F.2d at 849.

■ Carbide introduced two surveys in evidence on the issue of likelihood of confusion.[10] The surveys, however, do not help on the secondary meaning issue. There is no apparent evaluation of the products which would form a basis for the acquisition of secondary meaning. Indeed, there is no showing that the interviewee had past experience with Carbide's products so as to establish brand awareness.

Carbide failed to prove that the EVEREADY mark has acquired secondary meaning. Accordingly, since EVEREADY is a descriptive term without secondary meaning, it is not entitled to trademark protection.

## B. LIKELIHOOD OF CONFUSION

Assuming *arguendo* that EVEREADY is either (1) a non-descriptive term or (2) a descriptive term which has acquired secondary meaning, the issue of whether Carbide established the requisite likelihood of confusion caused by the term "Ever-Ready" must be considered.

■ To be entitled to relief Carbide must show that Ever-Ready's use of the term "Every-Ready" is likely to confuse the public into believing that the product on which the term appears is produced by Carbide. There is no requirement that actual confusion occur. Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 611 (7th Cir. 1965); Keller Prods., Inc. v. Rubber Linings Corp., 213 F.2d at 386. Moreover, whether a prospective purchaser, seeing the marks of the parties side by side, would believe that the marks were the same, is not determinative. G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F. 385 (7th Cir. 1959); Albert Dickinson Co. v. Mellos Peanut Co., 179 F.2d 265 (7th Cir. 1950). Rather the crux of the matter is the purchasing public's state of mind when confronted by similar marks singly presented. G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d at 388.[11]

Since it is the effect on prospective purchasers that is important, the conditions under which they act are vital.

*Competition between Carbide and Ever-Ready.* In the present case, Carbide and Ever-Ready do not sell competing goods. Carbide employs its EVEREADY mark in the sale of batteries, flashlights, lanterns and miniature lamp bulbs advertised for automobile and marine use. Ever-Ready does not sell batteries. The only flashlights and lanterns sold by it bear the tradenames of the products' manufacturers, which is not Ever-Ready. Moreover, Ever-Ready does not distribute miniature bulbs for automobile and marine use, but limits sale of its bulbs to those intended for use in high intensity home lamps. The fact that Carbide's miniature bulbs, advertised only for automobile and marine use, can be used in high intensity lamps is inconclusive since the consuming public is not aware of and has no way of knowing the interchangeability of the Carbide bulb. Finally, Carbide does not

10. Carbide introduced into evidence two surveys. One survey involved the use of the term "Ever-Ready" on high intensity minibulbs and sought to determine whether such use would likely confuse the public into believing that the bulbs were produced by Carbide. The other survey's purpose was the same but it involved the use of the term "Ever-Ready" on lamps.

The surveys and the weight to be accorded them on the issue of the likelihood of confusion are discussed *infra* at pp. 292–294.

11. Consumer surveys and evidence of actual confusion are the best, if not the only means, to determine the prospective purchaser's state of mind.

sell any of the various other products sold by Ever-Ready, e.g., lamps, ashtrays, vacuum jugs and other gift items.

■ The absence of competition between Carbide and Ever-Ready, however, is not necessarily fatal to Carbide's claim. Beef Eater Restaurants, Inc. v. James Burrough, Ltd., 398 F.2d 637 (5th Cir. 1968) (Beefeater for gin enforced against Beef/Eater for restaurants); Yale Electric Corp. v. Robertson, 26 F. 2d 972 (2d Cir. 1928) (Yale mark on locks and keys enforced against Yale on flashlights and batteries); Wall v. Rolls-Royce of America, Inc., 4 F.2d 333 (3d Cir. 1925) (Rolls-Royce for automobiles and airplanes enforced against Rolls Royce for radio tubes).[12] Carbide need only show that Ever-Ready's products are sufficiently related so that the public is likely to assume that Carbide is their source.

Nothing was presented at trial establishing a relationship between Ever-Ready miniature bulbs and desk lamps and Carbide's flashlights, batteries, lanterns and bulbs. Carbide attempted to show that a camping lantern manufactured by it was similar to Ever-Ready's desk lamps. The comparison was not persuasive. Similarly, Carbide relied on the fact that its automobile and marine bulbs were interchangeable with Ever-Ready's high intensity miniature bulbs. Again, while there was obviously some relationship established, it could not result in confusion since the consuming public was unaware of the interchangeability.

■ Assuming *arguendo* that the parties' products are related, there still must be independent proof that confusion is likely. Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967). Carbide also failed here.

*Actual Confusion.* Carbide introduced evidence of three instances of alleged actual confusion. Of the three, two occurred after the filing of the complaint.[13] First, Carbide introduced a complaint letter from a Mrs. Kaplan in San Francisco which was mailed December 29, 1971. When initially sent, the letter was addressed to Ever-Ready in Chicago,[14] but was returned to Mrs. Kaplan by the Post Office for "insufficient address."[15] Only after the letter's return did Mrs. Kaplan send it to Carbide in New York. This incident does not prove that Mrs. Kaplan was confused. Initially she knew from whom she purchased the defective product since she addressed the letter to Ever-Ready in Chicago. Indeed, she gave the exact address which appears on Ever-Ready's miniature bulb blister packs. At the least, this incident shows that Mrs. Kaplan did not identify Carbide as the source of the product.[16]

Next Carbide called a Mrs. Ballis to testify. On October 11, 1971, a Mr. Speckman, at that time Carbide's Chicago counsel, instructed Mrs. Ballis, his secretary, to go out and purchase EVEREADY high intensity miniature lamp bulbs, well knowing that Carbide did not

---

12. Interestingly, the trademarks in these cases had gained fame and notoriety for excellence and quality. In the present case there is no evidence that the EVEREADY mark had gained such stature.

13. The other instance of alleged confusion occurred the day before the filing of the complaint December 29, 1971.

14. The envelope read:
 "Ever-Ready, Inc.
 Chicago, Illinois 60607"
 The zip code appearing on the envelope was the correct Ever-Ready zip code.

15. The declaration "insufficient address" on the envelope, if offered for the truth of it, is hearsay. Consequently, the only meaning which I can ascribe to it is that the letter reached some point in postal delivery; that the Post Office returned it to Mrs. Kaplan who subsequently addressed a second envelope to Carbide in New York.

16. There is no evidence in the record that Mrs. Kaplan's remarks in her letter regarding the quality of the goods and "your good reputation" were directed particularly at Carbide.

manufacture such bulbs.[17] Thereafter, Mrs. Ballis proceeded to Marshall Field & Co., a department store in Chicago. The Field's sales clerk showed Mrs. Ballis Ever-Ready's miniature bulbs, who insisted that those particular bulbs were not manufactured by Carbide. Despite Mrs. Ballis' protests, the sales clerk assured her that the bulbs were made by Carbide. After purchasing the Ever-Ready bulbs, Mrs. Ballis returned to Speckman to inform him of what transpired. According to Mrs. Ballis, his reaction was "kind of humorous." Record, Vol. 2, at 313. Immediately, however, he requested Mrs. Ballis to write down what had happened.

The sales clerk's confusion is not entitled to any weight. Obviously the desire to make a sale influenced her actions. At least, it is impossible to distinguish between her alleged confusion and her desire to make a sale. Moreover, evidence of this type, manufactured by a party after a complaint has been filed, is suspect.

 Finally, Carbide called a Mrs. Lonczak and her daughter, Barbara, to testify to their alleged confusion regarding the source of certain miniature lamp bulbs purchased by them. Mrs. Lonczak had purchased miniature lamp bulbs marked "Ever-Ready" for Barbara's reading lamp. When the bulbs burned out, Barbara wrote a letter protesting the poor quality of the bulbs. In addressing the letter, however, Barbara and Mrs. Lonczak ignored completely the Chicago address of Ever-Ready appearing on the blister package which carried the bulbs and instead used Carbide's New York address.[18] Apparently, the obvious difference in the addresses was of no moment. Also, the testimony establishes that Mrs. Lonczak did not examine the "Ever-Ready" mark on the miniature bulbs until after she was contacted by Carbide's counsel. Record, vol. 1 at 141–42. The most cursory examination of the marked "Ever-Ready" and EVEREADY reveals their dissimilarities[19]. Occasional confusion by careless and inattentive people cannot sustain an action for trademark infringement and unfair competition. S. C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129, 141 (6th Cir. 1959).

 *Survey Evidence.* Carbide introduced in evidence two surveys to establish the likelihood of confusion caused by the term "Ever-Ready" with its mark EVEREADY. While the surveys were ruled admissible prior to trial, the question of the weight to be accorded them was reserved expressly for trial.[20] After considering the testimony

---

17. At the time Speckman had in his possession Ever-Ready blister pack cards containing its high intensity miniature bulbs. The alleged purpose of the Ballis excursion, as represented to her, was to enable Speckman to compare Ever-Ready and Carbide bulbs.

18. Mrs. Lonczak called telephone information in Chicago for Ever-Ready's complete Chicago address. After being told by the operator that there were several Ever-Ready's listed in Chicago, Mrs. Lonczak terminated her Chicago efforts and telephoned the store at which she purchased the bulbs. She obtained therefrom Carbide's New York address. Arguably, the testimony of Mrs. Lonczak and her daughter evidences only the store's confusion, especially in light of Mrs. Lonczak's Chicago efforts. Also, there is no evidence establishing whether Mrs. Lonczak correctly identified the product which she purchased so as to enable the store to identify Ever-Ready as the product's source.

19. In determining whether a mark causes confusion with another, I may compare and contrast the marks. When "Ever-Ready" and EVEREADY are so analyzed, I conclude that the two marks are not likely to be confused with each other. Although my conclusion is formed on the whole appearance, its expression must necessarily detail the differences. The EVEREADY mark as used has all letters capitalized. "Ever-Ready" as used only has the "E" and "R" capitalized. Ever-Ready's mark consists of two words. The marks are spelled differently. The EVEREADY mark appears in ascending and descending block letters and appears generally on a blue or red background, which is pentagonal or hexagonal in shape. "Ever-Ready" is written in descending script on a black trapezoidal background.

20. On April 11, 1973, Judge Tone ruled "conditionally" that the surveys were admissible in evidence. In suggesting certain changes

of Carbide's expert, Thomas Fitzpatrick (hereinafter "Fitzpatrick"),[21] who supervised the preparation[22] and giving of the surveys, and analyzing the survey questions, I conclude that the surveys are entitled to little, if any, weight.

First Carbide introduced the mini-bulb survey in evidence. The purpose of the offer was to establish that the use of the term "Ever-Ready" on Ever-Ready's high intensity miniature bulbs was likely to confuse the public into believing that the bulbs were produced by Carbide. 1,014 persons were interviewed. Each interviewee, after qualifying for the survey, was shown a blister pack of Every-Ready miniature bulbs and asked:

Question 1: Who do you think puts out these mini-bulbs?

Question 2: What makes you think so?

Question 3a: Have you seen or heard of any advertising by the concern which you think puts out these mini-bulbs?

Question 3b: Please specify where, what type and features you recall.

Question 4: Please name any other products put out by the same concern which you think puts out these mini-bulbs.

Next Carbide introduced the lamp survey in evidence. Again, the purpose was to establish that the use of the term "Ever-Ready" on the lamps sold by Ever-Ready was likely to confuse the public into believing that the lamps were produced by Carbide. Like the bulb survey, each interviewee was shown the product marked "Ever-Ready", but un-like the bulb survey, the interviewees were asked only:

Question 1: Who do you think puts out the lamp shown here?

Question 2: What makes you think so?

Question 3: Please name any other products put out by the same concern which you think puts out the lamps shown here.[23]

Carbide claims that 615 of 1014 (61%) interviewees identified it in the bulb survey as the source of the miniature bulbs. Of those 615, 13 interviewees identified Carbide specifically in answer to Questions 1 and 2; 545 interviewees answered "batteries" and/or "flashlights" in response to Question 4, and 57 interviewees associated their responses to Questions 1 and 2 with Union Carbide advertising.

Also, Carbide claims that 557 of 1009 (55%) interviewees identified it in the lamp survey as the source of the product. Of those 557, 6 identified Carbide specifically in answer to Question 1 and 2 and 551 interviewees answered "batteries" and/or "flashlights" in response to Question 3.

Questions 1 and 2 of the bulb and lamp surveys establish nothing. The evidence shows that in the bulb survey, approximately 600 interviewees who responded "ever ready" to Question 1 answered "because it says so on the pack" or "because I can read it on the blister pack." At best, such responses show the reading ability of the interviewee. Certainly, the responses are equivocal on the issue of the product's source. Indeed, Fitzpatrick when asked:

. . . where the respondent answered "Ever-Ready" to Question [1],

---

in the framing of two survey questions, Judge Tone stated: "I am therefore not deciding or intimating any opinion as to whether the survey might be more or less persuasive if it were recast." Clearly the April 11 ruling did not go to the weight to be accorded the surveys.

21. Ever-Ready stipulated that Fitzpatrick is an expert in the field of market research and public opinion surveys.

22. Fitzpatrick had the final say on the wording of survey questions. Record, vol. 1 at 172.

23. Questions 1, 2, 3a, 3b and 4 of the bulb survey were numbered Questions 2, 3, 4a, 4b and 5 in the actual survey. Questions 1, 2 and 3 of the lamp survey were numbered Questions 2, 3 and 4 in the actual survey.

and to the follow-up Question [2], "Because it says so" or "I can read it on the packet," how does that prove anything other than that the respondent can read the name "Ever-Ready" on the packet?

responded:

I would say it does not help it. Record, vol. 2 at p. 249.

In light of the responses to Questions 1 and 2, Questions 3 and 4 of the lamp and bulb surveys respectively, proceeded to suggest an opinion of those interviewees who had not formed one. For example, in the bulb survey 179 interviewees responded initially, "I don't know" to Questions 1 and 2, but after Question 4 was asked, 48 of the 179 responded "batteries" or "flashlights." [24] A similar question was condemned as leading in General Motors Corp. v. Cadillac Marine & Boat Co., 226 F.Supp. 716 (W.D. Mich.1964). There General Motors sought to enjoin the Cadillac Marine & Boat Co. from manufacturing and selling "Cadillac" boats. A survey, consisting of an interviewer showing an interviewee a picture of a "Cadillac" boat advertisement and asking (1) who do you think puts out the boats shown . . . and (2) will you please name anything else that you think is put out by the same concern, was introduced in evidence to establish likelihood of confusion. The court, finding the second question defective on the grounds that it was leading and suggestive, stated:

"To demonstrate the propensity of the question to lead, an examination of the survey booklets provides many instances where a person who drew a complete blank on the initial question was suddenly reminded of cars and General Motors by the way in which the second question is phrased. This reminder was the product, not of the advertisement, but of the second question itself." 226 F.Supp. at 736.

In support of this conclusion, Fitzpatrick testified:

Question: Well, would you go so far as to say that the survey there conducted in the Cadillac case was not probative, or did not tend to show likelihood of confusion as to the source of origin of the Cadillac boats?

Answer: I would say that it was a leading questionnaire.

Question: And, therefore, slanted?

Answer: Yes.

Question: And, therefore, likely to lead to bias?

Answer: Possibly, yes.

Question: And, therefore, likely to lead to error?

Answer: Correct.[25]

Record, vol. 2 at pp. 226–227.

Strangely, Fitzpatrick does not reach the same conclusions on the bulb and lamp surveys here, despite the great similarities they share with the *Cadillac* survey.

Also Question 3a of the bulb survey biases that survey in favor of Carbide. Ever-Ready does not advertise its mini-bulbs. On the other hand, Carbide spent in excess of $50 million for advertising and promoting the sales of its EVER-EADY products between 1943 and 1973. Consequently, the only advertising that would suggest the source of the mini-bulbs would originate from Carbide.[26] In explaining why Question 3a was not included in the lamp survey, Fitzpatrick testified:

Question: What, again was your explanation for dropping Question [3a of the bulb survey] in the lamp survey?

---

24. Interestingly, these 48 interviewees were counted as cases of confusion.

25. The record does not support Carbide's contention that Fitzpatrick was restating what he understood to be the court's position in the *Cadillac* case.

26. Carbide argues that Ever-Ready's point of sale display advertising is sufficient to remove any bias from Question 3a. I disagree. Certainly, such displays do not resemble in kind and do not reach the magnitude of Carbide's national advertising over the past 30 years.

Answer: To the best of my knowledge I was informed that there was no advertising performed by the defendant on the lamp survey—on his lamps.

Question: Just no advertising or—who informed you of that?

Answer: The firm of Nims, Halliday.

Question: Well, what did they say to you on that specifically?

Answer: They said that the—when they asked me to prepare a questionnaire for the lamp study, I prepared an identical questionnaire for both studies, and they said, well, there no advertising—the defendant has not done any advertising. Do you think we should ask that particular question? I said no.

Question: And why did you think that that question should not be included if in fact the defendant had done no advertising of the lamp?

Answer: Because if we insert it there, I think you can be accused—we could be accused of showing a bias for the Union Carbide Company.

\* \* \* \* \* \*

Question: Well, how could you be accused of showing a bias for the Union Carbide Company by including Question [3a] if the defendant did no advertising of its product being surveyed.

Answer: Because if we asked that question of a respondent and the defendant did not use it, how could they possibly answer in terms of the defendants' product?

Question: And, therefore, the only advertising that would be likely to be called to mind would be Union Carbide's advertising?

Answer: That would be correct.

Record, vol. 2, at pp. 235–237.

Seemingly, the same rationale is applicable to the bulb survey. Succinctly, the bulb and lamp surveys do not establish the requisite likelihood of confusion between the term "Ever-Ready" and the mark EVEREADY.[27]

For the reasons hereinbefore stated, defendants' use of the term "Ever-Ready" does not constitute a violation of the trademark infringement laws.[28]

## II. UNFAIR COMPETITION

Carbide seeks relief based on Ever-Ready's alleged unfair competition.

First, the term "Ever-Ready" is different from the mark EVEREADY. *Supra,* note 19. Consequently, it is not likely that they will be confused. Assuming *arguendo,* however, that they are similar, Carbide has not proved the requisite likelihood of confusion. *Supra,* pp. 289–295.

Accordingly, I find that the use of the term "Ever-Ready" does not constitute unfair competition.

Carbide's claim for relief based on dilution under Ill.Rev.Stat.1973, ch. 140, § 22, is without merit. Accordingly that claim is rejected.

The foregoing will constitute findings and conclusions under Rule 52(a) of the Federal Rules of Civil Procedure. Judgment will enter dismissing plaintiff's complaint and defendants will have judgment for their costs.

27. Interestingly, 140 interviewees in the bulb survey identified a company other than Carbide and Ever-Ready as the source of the mini-bulbs. If the 36 interviewees who identified either Carbide [13] or Ever-Ready [23] as the source of the mini-bulbs are added to the 140 figure, the total number who identified a specific source for the product is 176. Of the 176, 163 [approximately 90%] interviewees identified Ever-Ready or someone other than Carbide as the products' source.

28. In light of my conclusion on the trademark infringement issue, I do not reach defendants' affirmative defense of laches.